Rockingham
No. 86-118

PENNY VERNET & a.

v.

TOWN OF EXETER

December 30, 1986

*Backus, Meyer & Solomon*, of Manchester (*Robert A. Backus* on the brief and orally), for the plaintiffs.

*Engel, Morse, Pudloski & Gearreald P.A.*, of Exeter (*David C. Engel* on the brief and orally), for the defendant.

*Stephen E. Merrill*, attorney general (*George Dana Bisbee*, senior assistant attorney general, on the brief and orally), for the State, as intervenor.

*Nadeau Professional Offices*, of Rye (*J. P. Nadeau* on the brief), by brief for the Town of Rye, as *amicus curiae*.

JOHNSON, J. This appeal is from a decision of the Superior Court (*Nadeau*, J.) that citizens of the town of Exeter may not prohibit the selectmen from implementing a nuclear emergency response plan by so voting at town meeting. We find no error and affirm. The issue to be decided is whether a town meeting vote, requiring that no town officials and agencies of Exeter be allowed to implement a State-approved plan for a possible nuclear disaster at the Seabrook nuclear plant, is a valid exercise of the powers of a town meeting. We hold that the town meeting vote, which attempted to restrict the selectmen's authority to work effectively with State officials on such a plan, was beyond the authority granted to citizens at town meeting.

RSA 107-B:1 (Supp. 1986) states that "[t]he civil defense agency shall, *in cooperation with* affected local units of government, initiate and carry out a nuclear emergency response plan" (NERP) (emphasis added). During the spring of 1983, a general NERP was prepared by the State civil defense agency and sent to Exeter to be used as a guideline for preparing a plan for the town. An evacuation planning committee was established by the board of selectmen for the purpose of establishing a NERP. This committee, and the town department heads affected by the plan, worked together and drafted a NERP for Exeter. The plan was made available to residents in the town library.

A number of voters in the town of Exeter resisted this plan. In the town warrant at the 1983 town meeting, the residents of Exeter adopted the following article:

> "to see if the Town will instruct its Selectmen to bring any Town related evacuation, relocation or emergency response plans for the Seabrook Nuclear Project or Nuclear War which are developed by or for the Town to Town Meeting for approval by majority vote, and furthermore, that no Town official or agency be allowed to promote the implementation of any plans that have not been approved by the Town Meeting."

A related article was adopted at the 1984 Exeter town meeting:

> "to see if the Town will vote to state the emergency planning which has been done to date is ineffective in providing reasonable assurance that adequate protective measures can and will be taken in the event of a radiological emergency at Seabrook Station."

In July, 1984, the town selectmen approved Public Service Company's applications for "pole licenses" pursuant to RSA 231:161, IV to VI. These licenses allow installment of sirens and other warning devices to aid with the company's off-site evacuation plan in the event of a nuclear accident at Seabrook Station. Thereafter, the town participated in an emergency response exercise.

The original plaintiffs filed a petition for declaratory and injunctive relief, seeking to prevent the town from participating in any future emergency drills or exercises to practice the implementation of the emergency plan. The preliminary injunction was denied on the ground that the plaintiffs "failed to show the essential element of irreparable harm."

At the final hearing on the petition for declaratory judgment, the present plaintiffs claimed that the vote taken at the 1984 town meet-

ing prohibited action by Exeter town officials which would constitute "implementation" of a NERP for the town. The trial court held that:

> "[l]ocal refusal to cooperate or to approve plans cannot prevent the civil defense director from carrying out [the] duty to initiate and implement a nuclear emergency response plan. . . . The powers conferred by . . . RSA 107-B clearly establish a statutory scheme for nuclear emergency response planning which cannot be overridden by a town."

We agree and affirm.

■ We begin our analysis with a discussion of the relevant State statutes dealing with civil defense preparedness. RSA chapter 107, the Civil Defense Act (the Act), was initially adopted in 1949 and provides for a comprehensive program of civil defense preparedness which calls for coordination in the planning for and response to civil defense emergencies. The purpose of the Act is to provide a plan for carrying out the necessary emergency functions "in order to provide for the common defense and to preserve the lives and the property of the people of the state" from the threat of harm in the event of any natural or *man-made emergency*. RSA 107:1.

The Act provides the Governor with the "general direction and control of the civil defense agency," RSA 107:6, and further authorizes him or her to assume "direct operational control . . . of any or all civil defense forces" in the State during a civil defense emergency. RSA 107:8(a).

The Act creates a civil defense agency headed by a State director who is appointed by the Governor and is subject to his or her direction. The director is responsible "for carrying out the program for civil defense of the state." RSA 107:3. The director's duties include coordinating the activities of all organizations for civil defense within the State, and maintaining a liaison with, and cooperating with, civil defense agencies of other States and the federal government. RSA 107:3. Hence, the civil defense agency is modeled under a military chain of authority, with the Governor as the ultimate leader and with subordinates to carry out the plan.

■ The legislature also established a key role for local government. The statutory scheme calls for all civil defense plans and programs of the State's political subdivisions to be integrated into and coordinated with the State's comprehensive plan as fully as possible. RSA 107:6, II. The legislature also provided for local civil defense

organizations to carry out the local duties and responsibilities under the overall State plan.

> "*Each political subdivision of the state* is authorized to and *shall establish a local organization for civil defense subject to the direction and control of* [*its*] *city council or selectmen.* . . . [and] *shall perform civil defense functions within the territorial limits of a political subdivision* within which it is organized."

RSA 107:10(a) (emphasis added). Thus, under the Act local civil defense organizations have a definite role. However, the Governor has the ultimate authority for civil defense. RSA 107:6, :18.

When the Act was adopted in 1949, the threat of a nuclear energy plant failure was not within the contemplation of the legislature. Hence, in 1981, the Nuclear Planning and Response Program, RSA chapter 107-B, was enacted to supplement the civil defense law then in force. The legislature's statement of purpose for RSA chapter 107-B included findings that the State must initiate a program to develop and implement a NERP in conformity with federal regulations and that the nuclear operating utilities should pay for the cost of such emergency plans.

The plaintiffs argue that because RSA chapter 107-B is more specific as to nuclear emergencies, it alone controls State actions relating to such potential emergencies. We reject this contention. The authority to prepare for and respond to "man-made" nuclear disasters is an expansion of authority already contained in RSA chapter 107. The Governor, and his or her designees, are ultimately responsible for radiological emergencies, as they are for any other civil defense emergency. RSA 107-B:6 specifically recognizes the continuing responsibility of the Governor by providing: "[i]n the event of a radiological emergency at a nuclear electric generating facility where the responsible utility is unable to control the situation as necessary to protect public health and safety, the governor shall regulate the utility under RSA 107:6." This latter section defines in broad general terms the civil defense powers of the Governor in the event of a disaster.

We read RSA chapters 107 and 107-B as complementing each other. The two statutes "should be construed, so far as reasonably possible, not to contradict each other." *State v. Woodman*, 114 N.H. 497, 500, 323 A.2d 921, 924 (1974). Hence, we read RSA 107-B:1 as being an adjunct to the overall State civil defense plan and not as an isolated statute relating to potential radiological disasters.

The force of the vote of the Exeter town meeting must be

viewed in the context of the scope of the authority granted to any political subdivision of this State. This court has consistently held that "towns and cities have only those powers which are granted to them by the legislature." *Seabrook Citizens v. Yankee Greyhound Racing, Inc.*, 123 N.H. 103, 108, 456 A.2d 973, 975 (1983); *Public Serv. Co. v. Town of Hampton*, 120 N.H. 68, 71, 411 A.2d 164, 166 (1980). Local legislation must not be inconsistent with State law. *State v. Driscoll*, 118 N.H. 222, 224, 385 A.2d 218, 220 (1978).

■ The 1983 Exeter town meeting vote attempted to prohibit the town officials from implementing any NERPs "that have not been approved by the Town Meeting." This vote is directly in conflict with RSA 107:10(a), which provides that: "each local organization for civil defense shall perform civil defense functions" within the town "subject to the direction and control of [the board of] selectmen." No power is reserved for the town meeting in carrying out civil defense functions; as such the town meeting vote has virtually no effect. The board of selectmen have the additional responsibility of "perform[ing] the duties by law prescribed" and not simply managing "the prudential affairs of the town." RSA 41:8. Hence, where State law mandates that selectmen take responsibility for civil defense functions, the selectmen must carry out this duty. In doing so, of course, State officials should promote the involvement of, and coordination with, the local civil defense organization. *See* RSA 107:1.

■■ The trial court found that the wording of RSA 107-B:1 had a clear purpose which towns should not be permitted to defeat. In construing the meaning of a statute, we look first to the words used by the legislature. *See Corson v. Brown Prods., Inc.*, 119 N.H. 20, 23, 397 A.2d 640, 642 (1979). RSA 107-B:1 states that "[t]he civil defense agency shall, *in cooperation with* affected local units of government, initiate and carry out a nuclear emergency response plan." (Emphasis added.) Cooperation, as defined in Webster's Dictionary, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 501 (1967), is "common effort or labor." Nowhere in the definition is it stated, nor do we find, that the meaning of "in cooperation with" is synonymous with "approved by." Accordingly, we interpret the statute to mean that the State civil defense agency must enlist the *aid* of the towns when preparing a NERP for each of the affected towns, so that input will be received from each of the affected areas. This does not, however, give a town, in this case the town of Exeter, veto power over NERPs developed by the State civil defense agency.

*Affirmed.*

All concurred.