Merrimack
No. 82-220

STABLEX CORPORATION

v.

TOWN OF HOOKSETT *& a.*

December 28, 1982

*Devine, Millimet, Stahl & Branch P.A.*, of Manchester (*Joseph A. Millimet* and *Kevin C. Devine* on the brief, and *Mr. Millimet* orally), for the plaintiff.

*Brown & Nixon P.A.*, of Manchester (*David W. Hess* on the brief and orally), for the defendants.

*Gregory H. Smith*, attorney general (*E. Tupper Kinder*, assistant attorney general, and *Robert P. Cheney, Jr.*, attorney, on the brief, and *Mr. Kinder* orally), for the State of New Hampshire, as amicus curiae.

*William E. Brennan P.A.*, of Manchester, and *New England Legal Foundation*, of Boston, Massachusetts (*Mr. Brennan* and *Robert R.*

*Ruddock* on the brief), by brief for the Business and Industry Association of New Hampshire, as amicus curiae.

BROCK, J.   This is an appeal by the plaintiff, Stablex Corporation, from an adverse decision of the Superior Court (*Dunfey*, C.J.), disposing of its joint petition: (1) seeking a declaratory judgment, and (2) appealing a decision of the Town of Hooksett's Planning Board. For the reasons that follow, we reverse.

Since 1980, Stablex has been in the process of attempting to obtain State and local approval of its plan to construct a hazardous waste disposal facility in Hooksett. In its petition for *declaratory judgment*, Stablex challenged the legality of certain ordinances adopted by the Town of Hooksett, which required that any proposed hazardous waste facility be subject to a popular vote and therefore a potential local veto. Stablex claimed that such ordinances were barred by preemptive State and federal legislation relating to hazardous waste facilities. In the *appeal* portion of the petition, Stablex challenged the legality of a February 2, 1981, decision by the Hooksett Planning Board, in which Stablex's application for site-plan approval was denied.

On appeal to this court, the parties are not in agreement as to whether Stablex's appeal of the planning board's decision, which had to be in the form of a petition for a writ of certiorari pursuant to RSA 36:34 (Supp. 1981), was ever acted on with finality by the trial court. The defendant Town of Hooksett argues that the writ of certiorari was never granted and that the superior court opinion in effect merely constituted "temporary" denial of that writ until such time as Stablex had completed certain proceedings before the State Bureau of Solid Waste Management. The town claims that this action was well within the trial court's discretionary power under RSA 36:34 (Supp. 1981).

Stablex maintains that subsequent to the initial filing of its joint petition, counsel for both parties agreed that the appeal of the planning board's decision should be briefed and acted upon only *after* the declaratory judgment action had been decided. Stablex claims that the court nonetheless made a final decision on the merits of the appeal because of the manner in which the court ruled on a number of procedural motions pertaining to the appeal. This action by the court, Stablex maintains, violated its right to judicial review under RSA 36:34 (Supp. 1981).

Because we hold that the superior court erred in ruling that local control over the siting of hazardous waste disposal facilities had not been preempted by State and federal legislation, the issue of

whether and how the petition for a writ of certiorari was acted upon is moot.

*FACTS.*

Since 1980, Stablex Corporation has held an option on land in Hooksett that is zoned industrial pursuant to the following provision of the Hooksett Zoning Ordinance:

> "VII.B. *Permitted Uses.*
>
> All types of manufacturing, processing, fabrication, assembly, freight handling, warehousing and similar operations, including administration and research, provided such operations are so operated and noises, glare, heat, fumes, odors, and similar conditions are so controlled that they will not be obnoxious or injurious to adjoining property."

At approximately the time that it purchased its option on the land, Stablex approached town officials to make them aware of its interest in building a hazardous waste disposal facility on the site for the treatment, neutralization, and disposal of inorganic hazardous wastes.

Since 1979, anyone seeking to construct or operate a hazardous waste treatment facility in this State has had to secure prior State approval of the project under a complex regulatory scheme which is discussed below. Stablex began the process required for State approval in September, 1980, by filing an application with the State to construct and operate a waste treatment facility. At the same time, it submitted a duplicate copy of the application to the town for review by its planning board.

The State has not yet completed its review of Stablex's application. A series of public hearings and meetings conducted by the Hooksett Planning Board in 1980 and 1981, however, resulted in two significant actions by the town affecting Stablex's proposal.

First, on December 19, 1980, the town's board of selectmen presented, and a special town meeting adopted, a set of town ordinances alleged to have been enacted under the provisions of RSA 31:39 (amended 1981). These ordinances provide in relevant part:

> "BY–LAWS RESPECTING THE COLLECTION, PROCESSING, REMOVAL AND DISPOSAL OF HAZARDOUS WASTE MATERIAL

ARTICLE I

1. No privately owned or privately operated dump, storage place, or other facility primarily used for the collecting, receiving, processing, reprocessing, treatment, recovery, storage, disposal, or burying of hazardous waste shall be maintained within the Town of Hooksett, except by prior permission of the voters of the Town obtained in an annual or special town meeting.

. . . .

ARTICLE III

1. No building shall be erected nor any land used for the primary purpose of collecting, receiving, processing, reprocessing, treating, recovering, or separating hazardous waste, except by prior permission of the voters of the Town obtained at an annual or special town meeting."

These ordinances clearly provided that notwithstanding State approval of a proposed hazardous waste facility, local approval in the form of a popular referendum was required in order for such a facility to be built in the town.

Second, on February 2, 1981, the Hooksett Planning Board voted to deny Stablex's application for site-plan approval, basing its decision on two sections, articles I (preamble) and III F of the Hooksett Zoning Ordinance. The planning board took the position that insufficient information had been submitted to permit it to determine whether the proposed plant would be injurious to "the comfort, peace, enjoyment, health and safety of the community."

Stablex maintains that the town had no authority to enact ordinances requiring local popular approval of a hazardous waste facility because State and federal legislation enacted in 1979 and 1981 had clearly preempted this area of regulation. It follows that the actions of the Hooksett Planning Board would also be invalid if the claim of State and federal preemption prevails. Finally, Stablex argues that the town's actions, even if not barred by State preemption, nonetheless deprived it of its vested rights in property without due process of law. We need not address this argument in light of our holding that State legislation preempted the area of hazardous waste regulation.

## THE REGULATORY FRAMEWORK.

The disposal of hazardous wastes has become a problem of enormous significance at both the State and national levels. The

uncontrolled disposal of such wastes is recognized as posing a most serious threat to public health and safety. In response to this threat, the Speaker of the New Hampshire House released a four-volume report in 1980 discussing hazardous waste problems on a State and national level as well as some existing and proposed legislative responses to those problems. This report notes that the United States Environmental Protection Agency (EPA) has estimated that approximately fifty-seven million metric tons of hazardous wastes are generated each year in the United States. SPEAKER'S RESOURCE REPORT ON HAZARDOUS WASTE 27 (1980) (available at the New Hampshire State Library in Concord). The EPA estimates that ninety percent of these wastes are disposed of improperly. *Id.* at 1693. New Hampshire generates an estimated sixteen million gallons of hazardous chemical wastes each year. *Id.* at 7, 30–31.

Our State lacks any approved hazardous waste disposal facility. *Id.* at 41. There are, however, eight known sites in New Hampshire where hazardous wastes have been illegally disposed of, the most notorious of which are located in Nashua, Epping, Kingston, and Raymond. *Id.* at 27–30, 1635. Cleanup costs for these sites alone are estimated to be in the millions of dollars. *Id.* at 21, 27–29, 30, 38. State and federal hazardous waste legislation was thus enacted against a background that can only be termed a State and national emergency.

*The Federal Regulations.*

In 1976, the United States Congress enacted Public Law 94–580, the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C §§ 6901–6987, which authorizes the EPA to promulgate national rules and regulations governing the identification, generation, storage, treatment, and disposal of hazardous wastes. *See id.* §§ 6921–6924. Section 6925 of RCRA requires the administrator of the EPA to promulgate regulations pursuant to which any person owning or operating a hazardous waste treatment facility must acquire a permit. Such permits are to be issued only after a facility has satisfied the strict standards set forth in section 6924.

A fundamental assumption of the RCRA is that the individual States would continue to improve their own existing programs as well as develop new programs in conformity with the federal standards. For example, a House committee report on the RCRA states:

"It is the Committee's intention that the States are to have primary enforcement authority and if at anytime a State wishes to take over the hazardous waste program it

is permitted to do so, provided that the State laws meet the Federal minimum requirements for both administering and enforcing the law."

H.R. REP. No. 94-1491, 94th Cong., 2d Sess. 24, *reprinted in* 1976 U.S. CODE CONG. & AD. NEWS 6238, 6262. The House committee report added that one of the general purposes of affording the States the option of developing such programs was that:

"by permitting states to develop and implement hazardous waste programs equivalent to the federal program, the police power of the states are utilized rather than the creation of another federal bureaucracy to implement this act."

*Id.* at 30, *reprinted in* 1976 U.S. CODE CONG. & AD. NEWS at 6268.

*The 1979 New Hampshire Legislation.*

In 1979, the New Hampshire Legislature enacted the State's first hazardous waste management program. *See* Laws 1979, ch. 347 (RSA 147:48 to :57). In its statement of "Findings and Purpose," the legislature declared:

"(d) That as the result of a hazardous wastes survey and the lack of hazardous waste treatment, storage or disposal facilities within the state, the problem of managing hazardous waste has become a matter of concern to the state.

II. The general court hereby declares the purposes of this act are:

(a) To protect the public health and safety, and the environment from the effects of the improper, inadequate, or unsound management of hazardous wastes; and

(b) To establish a program of regulation over the generation, storage, treatment, and disposal of hazardous wastes; and

(c) To assure the safe and adequate management of hazardous wastes within this state."

Laws 1979, 347:1.

Chapter 347 established an administrative body, the Bureau of Solid Waste Management, to which all permit applications had to be submitted, and which was empowered to administer the comprehensive State program. The bureau was granted rule-making authority, which it used to develop and promulgate the New Hampshire Hazardous Waste Rules, which became effective on June

3, 1981. (Bureau of Solid Waste Management, Hazardous Waste Rules §§ 1905.01–.10.)

*The 1981 Recodifications.*

*RSA Chapter 147-A.*

In 1981, our legislature repealed the 1979 hazardous waste legislation, RSA 147:48 to :57, and recodified those sections as RSA chapter 147-A. Laws 1981, 413:2. RSA chapter 147-A re-establishes the Bureau of Solid Waste Management, giving it not only substantially the same powers it had under the original statute, but, along with the attorney general's office, some additional investigatory and enforcement powers. The provisions of RSA 147-A:4, II (Supp. 1981) require that each application for a permit must be accompanied by a fee of up to $1,000 to be used to finance an exhaustive review by the bureau's technical staff. The bureau's Hazardous Waste Rule section 1905.08 contains an exhaustive list of the technical standards governing the review process, standards which are designed to ensure the protection of human health and the environment. RSA 147-A:5 (Supp. 1981) requires that an applicant wishing to build a hazardous waste treatment facility provide satisfactory evidence of its financial responsibility, so the bureau may be assured that the facility will comply with the appropriate environmental standards and protect the public health and safety. RSA chapter 147-A further provides for strict liability for operators and increases the penalties for operator violations. RSA 147-A:9 (Supp. 1981); RSA 147-A:16, II (Supp. 1981).

*RSA Chapters 147-B, 147-C, and 147-D.*

The General Court also enacted three new statutory chapters in 1981, RSA chapters 147-B, 147-C, and 147-D (Supp. 1981).

RSA chapter *147-B* provides for a hazardous waste cleanup fund to deal with past illegal dumping activities in this State.

RSA chapter *147-C* provides for municipal hazardous waste facility review committees. This statute mandates that the bureau notify the governing body of the town in which a proposed hazardous waste facility is to be located. The town's governing body is then required to appoint a municipal review committee. RSA chapter 147-C thus mirrors the bureau's Hazardous Waste Rule section 1905.09(h), which also provides for a municipal review committee. While contemplating duties for the committee that are similar to those prescribed by the bureau's rule, RSA chapter 147-C goes further by making appointment of such a committee mandatory. *See* RSA 147-C:2, II (Supp. 1981). The bureau's rule had simply made appointment of the committee a discretionary matter.

The review committee is the body deemed to "[r]epresent the town in the public hearing process relating to the facility's permit application." RSA 147-C:4, I(a) (Supp. 1981). The committee is provided access to all information that is given to the bureau, except for materials that are considered trade secrets. The committee is charged with studying the effect that the proposed facility will have on the health and welfare of the people in the community, and on its environment and economy. Based on its study, the committee must "[s]ubmit a report to the bureau . . . containing the committee's recommendations regarding the proposed disposal facility, including a recommendation as to whether or not the site certificate should be granted." RSA 147-C:4, I(d).

Finally, RSA 147-C:7 (Supp. 1981) provides for an appeal by the committee to the commissioner of health and welfare if "the committee determines that the bureau proposes to issue a permit to a disposal facility which, in the judgment of the committee, does not adequately protect the health and safety of the residents of the town . . . ." RSA 147-C:7, I (Supp. 1981). The commissioner is required to hear this committee appeal on an expedited basis and must issue a decision within fifteen days.

RSA chapter *147-D* authorizes a town to levy fees on any hazardous waste facility located within its borders.

It is against this backdrop of comprehensive regulation that the Town of Hooksett asserts that its powers of "home rule" have not been preempted by State or federal legislation regulating hazardous wastes.

## *THE TOWN OF HOOKSETT'S PREEMPTION AND HOME RULE CLAIMS.*

In support of its position, the Town of Hooksett advances what is essentially a three-part argument. First, it claims that cities and towns in this State have long-standing powers of home rule enabling them to enact zoning ordinances and regulations for the protection of the health, safety, and welfare of their citizens. *See* RSA 31:60, :61, :62; RSA 36:21 (Supp. 1981); RSA 147:1, I (Supp. 1981). The town maintains, specifically, that cities and towns have long possessed the authority, under the police powers enumerated in RSA 31:39 (Supp. 1981) and its predecessors, to regulate the disposal of garbage and other waste materials. Finally, the town argues that section 293:1 of the 1977 session laws, which amended former RSA 147:26-a, constituted an express acknowledgment that municipalities could regulate commercial and industrial wastes. The town thus contends it has the *affirmative power* to enact the popular consent ordinances challenged here.

Alternatively, the town argues that while these long-standing powers *could* have been preempted by the State legislature, they *were not* so preempted by the hazardous waste legislation at issue in this case. The town thus claims in this context that RSA chapters 147-A, 147-B, 147-C, and 147-D, *at worst*, are silent as to the preemption of home rule powers. The town argues, therefore, that if the statutes are silent, we must hold that powers previously delegated to municipalities under other statutes have not been impliedly repealed because of the disfavor we accord the doctrine of repeal of statutes by implication. *See, e.g., State v. Miller,* 115 N.H. 662, 663, 348 A.2d 345, 346 (1975). The town suggests that this legislative silence on the question is of particular significance because the legislative history reveals that the subject of "home rule" was very much on the minds of legislators during the 1979 and 1981 legislative sessions. The town compares this legislative silence with what it claims is a clear subordination of home rule and an *express* preemption of the solid waste management field in a statute also adopted in 1981. *See* Laws 1981, ch. 566 (RSA ch. 149-L, now codified at RSA ch. 149-M (Supp. 1982)).

Finally, the town argues that, far from being "silent" on the issue of *home rule*, the hazardous waste legislation in fact expressly provides for it. In support of this argument, the town points to two provisions of the 1981 hazardous waste legislation. The town first relies on RSA chapter 147-C which, as noted before, establishes a municipal hazardous waste review committee. RSA 147-C:6 (Supp. 1981) provides for a limitation on the committee's power, which the town claims amounts to an *express* preservation of home rule. This section states:

> *"Committee's Powers.* This chapter shall not be deemed to permit the committee to preempt the powers of any local board or other local authority relative to the regulation of zoning and planning."

The town further relies upon RSA chapter 147-D, which allows a city or town in which a facility is located to levy fees on the facility. The legislature described such fees as being intended as a "positive incentive to foster the siting of these facilities." Laws 1981, 521:1, II. The town insists that this fee-enabling legislation makes sense only if the towns are understood as retaining the *option* of *rejecting* such facilities. In other words, the town argues that an "incentive" is only meaningful where choice exists. Thus, the town claims that the legislature, in RSA chapter 147-D, has expressly preserved home rule powers of municipalities in hazardous waste regulation.

*There Is No Tradition of Home Rule in the Regulation of Hazardous Wastes.*

■ We have no quarrel with the Town of Hooksett's claim that the legislature has delegated extensive zoning and regulatory powers to the cities and towns, enabling them to provide for and protect the public health and welfare. We do *not* agree, however, that the cities and towns in this State have been given concurrent affirmative authority to regulate the disposal of hazardous wastes by virtue of the statutory provisions the town cites. *See, e.g.,* RSA 31:60, :61, :62; RSA 36:21 (Supp. 1981); RSA 147:1, I (Supp. 1981); RSA 147:26-a, as amended by Laws 1977, 293:1; or finally, RSA 31:39 (Supp. 1981) and its predecessors. To the contrary, we find that until the legislature in 1979 enacted hazardous waste legislation, the problem of hazardous waste had never been explicitly addressed in this State. The only statutory provision cited by the town which *might* be understood as addressing hazardous waste disposal is former RSA 147:26-a, which, as amended by section 293:1 of the 1977 session laws, stated that:

> "A town or city providing facilities for the disposal of putrescible material, animal manure, commercial waste and industrial waste as defined in RSA 149:1 shall have the power to make by-laws governing such facility and fix reasonable rates for its use."

The town however, overlooks the fact that this statutory provision was *expressly* repealed by section 566:9 of the 1981 session laws, in the act in which the legislature established the State *solid* waste management program.

*The Field of Hazardous Waste Regulation Has Been Preempted by the State.*

The Town of Hooksett concedes that even if the towns had expressly possessed such powers under existing statutes, the State could nonetheless have enacted preemptive legislation on the subject. The town claims, however, that the legislation at issue here did not accomplish such preemption. We do not agree.

■ We conclude that the State hazardous waste statute, RSA 147:48 through :57 and its successor, RSA chapters 147-A through 147-D (Supp. 1981), arose from the legislature's serious concern over the lack of a comprehensive statewide program to deal with the growing problem of hazardous waste disposal. We find that the legislature, responding to the options offered by the federal government in the Resource Conservation and Recovery Act of 1976,

devised a comprehensive and detailed program of statewide regulation, which on its face must be viewed as preempting any local actions having the intent or the effect of frustrating it. Our holding in *Public Serv. Co. v. Town of Hampton*, 120 N.H. 68, 411 A.2d 164 (1980), is directly on point:

> "We regard it as inconceivable that the legislature, after setting up elaborate procedures and requiring consideration of every imaginable interest, intended to leave the regulation of transmission lines siting to the whim of individual towns. . . . Whatever power towns may have to regulate the location of transmission lines within their borders, that power cannot be exercised in a way that is inconsistent with State law."

*Id.* at 71, 411 A.2d at 166 (citations omitted).

We have consistently held that where the State has enacted a comprehensive regulatory scheme, no local actions or ordinances will be permitted to contravene it. *Town of Salisbury v. New England Power Co.*, 121 N.H. 983, 984–85, 437 A.2d 281, 282–83 (1981); *J. E. D. Associates, Inc. v. Town of Sandown*, 121 N.H. 317, 319–20, 430 A.2d 129, 130 (1981); *Region 10 Client Mgt., Inc. v. Town of Hampstead*, 120 N.H. 885, 888, 424 A.2d 207, 209 (1980). The fact that the legislature made certain aspects of the solid waste management program mandatory on the cities and towns, in its 1981 version of RSA 149-L, is inapposite here. First, towns already had, and had exercised, powers in the area of solid waste disposal under RSA 31:39; thus, the legislature may have felt it necessary to make clear that it intended to modify those powers. Furthermore, because every municipality has some need to dispose of its citizens' solid wastes, the legislature may well have desired to make participation in a statewide program expressly mandatory. In contrast, hazardous wastes are not produced in most communities; therefore, most municipalities do not have similar hazardous waste disposal needs.

It thus only remains to be considered whether RSA chapters 147-C and 147-D, which the town claims either expressly reserve or acknowledge the preservation of home rule powers, in fact accomplish this end. We are mindful, in this regard, of our obligation to construe these statutory provisions in a manner that is "consistent with the spirit and objectives of the legislation as a whole." *Appeal of Wood Flour, Inc.*, 121 N.H. 991, 995, 437 A.2d 286, 288 (1981). In this case, however, we conclude that the plain meaning of the statutory language at issue fails to support the Town of Hooksett's claims.

■ The town argues strenuously that RSA 147-C:6 (Supp. 1981) contains an express limitation on the powers of the municipal review committee. We hold that this provision means what it says; namely that nothing in *"this chapter"* which created the *municipal review committee* shall be deemed to permit *that* committee to preempt local powers of zoning and planning. Nowhere in RSA 147-C:6 (Supp. 1981) or any other part of the hazardous waste legislation is there an indication that the legislature intended this to be an overall limitation on the powers of the Bureau of Solid Waste Management which, in RSA chapter 147-A (Supp. 1981), has been given the sole authority to act with finality on permit applications.

■ The town's claim is further weakened by other language in the chapter it has cited. RSA 147-C:4, I(d) (Supp. 1981) provides that the municipal review committee shall submit a report to the bureau containing its *"recommendations* regarding the proposed disposal facility, including a *recommendation* as to whether or not the site certificate should be granted." (Emphasis added.) The statute goes on to provide for a right of appeal should the committee disagree with the bureau's decision to grant a site permit. RSA 147-C:7 (Supp. 1981). This language hardly supports the claim that the powers of any entity other than the committee itself are being limited, or that any entity other than the bureau has the authority to approve or disapprove a site-permit application.

■ As noted before, the Town of Hooksett also claims that the entire structure of RSA chapter 147-D (Supp. 1981), in which the legislature authorized the collection of fees from hazardous waste facilities, makes sense only if the cities and towns are understood to have retained an ultimate veto over the siting of such facilities. We do not find this argument to be persuasive. The declaration of purpose of RSA chapter 147-D itself states that the reason for the fee-imposing power conferred by the statute is to provide a *positive incentive* which *should not* be used as an exclusionary taxation mechanism. *See* Laws 1981, 521:1, II. Creation of the means for municipalities to derive revenue from hazardous waste disposal facilities appears to have been intended merely as an affirmative incentive for cities and towns to cooperate in locating such facilities within their borders. The converse is not implied; namely, that towns have the power to refuse such facilities, particularly in light of the legislature's admonition that such fees should not be used in an attempt to exclude such facilities.

*The Scope of State Preemption.*

The State program embodied in RSA chapters 147-A, 147-B, 147-C, and 147-D (Supp. 1981) represents a comprehensive plan intended to be implemented on a statewide basis. As such, it completely preempts the field of hazardous waste legislation in this State. We have stated repeatedly that "[t]owns may not regulate a field that the State has preempted." *J. E. D. Associates, Inc. v. Town of Sandown,* 121 N.H. at 319, 430 A.2d at 130; *see Town of Salisbury v. New England Power Co.,* 121 N.H. at 985, 437 A.2d at 283. The Town of Hooksett's popular consent ordinances are therefore invalid. It necessarily follows that the Town of Hooksett Planning Board has no powers with respect to the approval or disapproval of Stablex's application for a site permit to construct a hazardous waste facility on the land on which it has an option in Hooksett. Any local regulations relating to such matters as traffic and roads, landscaping and building specifications, snow, garbage, and sewage removal, signs, and other related subjects, to which any industrial facility would be subjected and which are administered in good faith and without exclusionary effect, may validly be applied to a facility approved by the State bureau.

*Reversed.*

KING, C.J., did not sit; the others concurred.