Hillsborough-southern judicial district
No. 95-571

TOWN OF PELHAM

v.

BROWNING FERRIS INDUSTRIES OF NEW HAMPSHIRE, INC. & a.

September 30, 1996

356

*Soule, Leslie, Zelin, Sayward & Loughman*, of Salem (*Diane M. Gorrow* and *Barbara F. Loughman* on the brief, and *Ms. Loughman* orally), for the plaintiff.

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*Robert P. Cheney, Jr.* on the brief and orally), for Browning Ferris Industries of New Hampshire, Inc. and Browning Ferris Industries, Inc.

*Jeffrey R. Howard*, attorney general (*Jeffrey A. Meyers*, assistant attorney general, on the brief and orally), for the State of New Hampshire.

THAYER, J. The State of New Hampshire Department of Environmental Services (DES) entered into a consent decree with Browning Ferris Industries of New Hampshire, Inc. and Browning Ferris Industries, Inc. (collectively, BFI) for the closure of a landfill located in the Town of Pelham (town). The town filed a petition with the Superior Court (*Dalianis*, J.) seeking to enjoin DES and BFI from proceeding with the closure without first complying with local zoning, site plan, and health regulations. The superior court dismissed the petition, holding that RSA chapter 149-M preempts local control of landfill closures, and the town appealed. We affirm in part, reverse in part, and remand.

The town alleges the following facts, which we assume true for purposes of this appeal only. BFI is the owner of the land on which the now defunct thirty-acre landfill is located. In 1985, the landfill was permanently closed in accordance with a landfill closure design approved by DES. The landfill cap subsequently failed, and DES brought suit against BFI, resulting in a consent decree approved by the superior court in June 1992. The town was not a party to this proceeding. The consent decree required BFI to submit a new

closure design and to reclose the landfill in accordance with RSA chapter 149-M and rules promulgated thereunder.

The new closure design submitted by BFI calls for the landfill to be covered by a new cap consisting of three layers — a plastic or rubber membrane placed directly over the trash, a middle layer consisting of chipped used motor vehicle tires, and a "biomix" top layer composed of sewage sludge, short fiber paper mill waste, and sand. Transportation of these materials to the site will require approximately 2,300 truckloads. In addition, the plan envisions a five-acre "staging area" adjacent to the landfill for the preparation and storage of the materials, three detention ponds to collect and filter runoff from the landfill, a building with a thirty-foot high smokestack and permanent flare burn as part of a methane gas recovery system, and relocation of the driveway leading to the site.

In its petition for preliminary and permanent injunction and for declaratory judgment, the town argued that the proposed reclosure constitutes a reopening of the landfill, requiring a special exception from the zoning board of adjustment to permit operation in a rural district and a variance to permit operation in an aquifer conservation district. The town further argued that the staging area, detention ponds, and methane recovery building constitute an expansion of a nonconforming use, also requiring a special exception and variance. In addition, the town contended that all aspects of the construction require site plan approval from the planning board. Finally, the town maintained that its health code regulations require approval for the operation of the landfill.

The superior court dismissed the town's petition, ruling that "compliance with local requirements urged in the instant case would frustrate the State's authority over closure of the landfill." On appeal, the town argues: (1) BFI is required under RSA 149-M:10 (1996) to obtain a permit for closure from DES, a precondition to which is compliance with the local regulations at issue in this case; and (2) even if RSA chapter 149-M preempts local regulations, the trial court erred in failing to acknowledge the residual authority left to towns under this court's decision in *Stablex Corp. v. Town of Hooksett*, 122 N.H. 1091, 456 A.2d 94 (1982).

■■ New Hampshire's solid waste management statute, codified as RSA chapter 149-M, implements the solid waste directives of the Resource Conservation and Recovery Act of 1976, 42 U.S.C. §§ 6901 *et seq.* (1994) (RCRA). RCRA was enacted by Congress in recognition of the increasingly national scope of the problem of waste disposal, 42 U.S.C. § 6901(a)(4), and has as its primary objectives the promotion of public health, protection of the environ-

ment, and conservation of material and energy resources through better management of solid and hazardous wastes. 42 U.S.C. § 6902. In furtherance of these objectives, RCRA provides for the promulgation of federal guidelines for solid waste management, *see* 42 U.S.C. § 6902(a)(8), and requires comprehensive planning of solid waste management at the state and regional level, *see* 42 U.S.C. §§ 6941, 6946.

Under RCRA, each State must establish a solid waste management plan and identify agencies responsible for the development and implementation of the plan. 42 U.S.C. § 6946. RSA chapter 149-M establishes New Hampshire's plan and designates the division of waste management (DWM), a division of DES, as the responsible agency. RSA 149-M:2 (1996). DWM is charged with regulating the "storage, transfer, treatment, processing, and disposal of solid waste . . . through administration of a permit system." RSA 149-M:3, IV (1996). Under RSA 149-M:10 (1996), a permit from DWM is required prior to the operation or construction of a solid waste facility. In addition, DWM is responsible for regulating "the closure of all solid waste facilities by establishing closure standards and through administration of a permit system." RSA 149-M:3, IV-a (1990). DWM has rulemaking authority with respect to its duties under the chapter. RSA 149-M:8, IV (1996).

A central feature of RSA chapter 149-M is the continued role of local government in solid waste management. In enacting the chapter, the legislature found: "The process of disposal of solid wastes has been and should continue to be primarily the responsibility of municipal government." Laws 1981, 566:1 (reaffirmed by Laws 1982, 37:1). Towns are responsible for providing or assuring access to an approved solid waste facility for their residents. RSA 149-M:13, I (1996). Towns may also make bylaws regulating the facility and setting rates for its use. RSA 149-M:13, II(a) (1996). Under RSA 149-M:17 (1996), each town is responsible for systematic planning for solid waste management within its boundaries. In addition, towns are required to participate in district plans for solid waste management. RSA 149-M:18 (1996). District plans must estimate types and amounts of solid wastes, identify types and capacities of solid waste facilities, and demonstrate district-wide disposal capacity for fifteen years. RSA 149-M:19 (1996).

In the present controversy, the town first argues that the permitting provisions of RSA chapter 149-M expressly require compliance with the local regulations at issue in this case. RSA 149-M:10, I, provides: "No person shall operate or construct a public or private facility without first obtaining a permit from the division

of waste management." A permit for a private facility is not effective "until the applicant submits evidence of compliance with all lawful local ordinances, codes and regulations that are consistent with a district plan." RSA 149-M:10, IV. The town concedes that it does not have an approved district plan, but argues that the penalty for this failure is not that private landfills are exempt from compliance with local regulations, but rather that DWM will develop the plan with costs assessed to the district. *See* RSA 149-M:18, IV. BFI counters that RSA 149-M:10 by its terms applies only to construction and operation, not closure, of a landfill; hence, the requirement under RSA 149-M:10, IV of compliance with local regulations is inapposite to a landfill closure.

We agree with BFI and hold that a permit under RSA 149-M:10 is not required for the closure of a landfill. When interpreting a statute, "we examine the statutory language itself and construe the law consistently with its plain meaning." *Penrich, Inc. v. Sullivan*, 140 N.H. 583, 589, 669 A.2d 1363, 1367 (1995). We examine a statute not in isolation, but in relation to the overall statutory scheme. *Opinion of the Justices (Solid Waste Disposal)*, 135 N.H. 543, 545, 608 A.2d 870, 872 (1992).

RSA 149-M:10, I, requires a permit for the operation or construction of a solid waste facility. Although closure could plausibly be described as part of the operation of a landfill, the legislative scheme reveals a contrary intent. The definitions section of RSA chapter 149-M does not define "operation," "construction," or "closure." *See* RSA 149-M:1. RSA 149-M:3, however, draws a distinction between the "storage, transfer, treatment, processing, and disposal of solid waste," RSA 149-M:3, IV, on the one hand, and the "closure" of a solid waste facility, RSA 149-M:3, IV-a, on the other. We see in this distinction an indication that the "closure" of a facility was not intended to qualify as "operation" or "construction" for purposes of RSA 149-M:10's permit requirement.

Our interpretation is borne out by a careful reading of RSA 149-M:10. Paragraph II-a requires each facility seeking a permit to demonstrate its capacity to collect, reclaim, and dispose of motor vehicle waste. Paragraph VI provides that permits are "continuous in duration, but may be suspended or revoked for cause." Paragraph II requires the applicant to "demonstrate that the proposed facility provides a substantial public benefit pursuant to RSA 149-M:10-c." In determining whether a substantial public benefit will be provided, DWM must consider the "need for a solid waste facility of the proposed type, size and location"; whether the proposed facility will contribute to the reduction of solid waste under RSA 149-M:1-a

(1996); and whether the proposed facility will assist in carrying out the State solid waste management plan or a district plan under RSA 149-M:18. RSA 149-M:10-c, III (1996). Each of these provisions would make little sense if applied to the closure of a facility.

▮▮ The town argues that RSA 149-M:3, IV-a, which grants DWM the responsibility and authority to regulate the closure of solid waste facilities "through administration of a permit system," cannot be squared with this result. We disagree. Nothing in the language of RSA 149-M:3, IV-a indicates that a *separate* permit under RSA 149-M:10, beyond the permit for construction or operation, is required for the closure of a solid waste facility. Rather, we interpret RSA 149-M:3, IV-a as instructing DWM to provide for closure in its permits for construction and operation under RSA 149-M:10, but not to require separate permits for closure. Indeed, DWM appears to have interpreted RSA 149-M:3, IV-a in this fashion. *See* N.H. ADMIN. RULES, Env-Wm 2507.2 (landfill "operated in compliance with its permit shall be subject to closure on a schedule specified in the permit").

The town contends that even if RSA 149-M:10 does not apply to closures *per se*, the closure proposed by BFI amounts to the operation of a facility within the meaning of RSA 149-M:10, I, because it calls for the "disposal" of solid waste; namely, the chipped tires and part of the biomix being used in the cap. RSA 149-M:1, XIX (1996) defines "solid waste" generally as "any matter consisting of putrescible material; refuse; or residue from an air pollution control facility; and other discarded or abandoned material." RSA 149-M:1, V (1996) defines "disposal" as the "discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste into or onto any land or water so that such solid waste or any constituent of it may enter the environment, be emitted into the air, or be discharged into any waters, including groundwater." RSA 149-M:1, VIII (1996) defines "facility" to include "a location or system for . . . disposal of solid waste." Thus, according to the town, the "disposal" of "solid waste" proposed in BFI's reclosure plan amounts to the operation or construction of a "facility" requiring a permit under RSA 149-M:10, with the concomitant requirement of compliance with local regulations under RSA 149-M:10, IV.

▮ We cannot accept the town's argument. Although it is not unpersuasive as a technical reading of the statute, we do not believe that the statute's definition of "solid waste" includes materials approved by DWM for use in a landfill cap. RSA 149-M:1, XIX uses the words "putrescible material; refuse; . . . *and other discarded or*

*abandoned material.*" (Emphasis added.) The placement and meaning of this latter phrase indicate that, to be solid waste, matter must be "discarded" or "abandoned." *See Doggett v. Town of North Hampton*, 138 N.H. 744, 746, 645 A.2d 673, 674 (1994) (words of statute construed together, not read in isolation). In this case, materials approved by DWM for use in the cap will not be discarded or abandoned, but rather will serve as construction material.

Having concluded that the permitting provisions of RSA 149-M:10 do not apply to BFI's proposed closure plan, we are left to consider the preemptive effect of RSA chapter 149-M on the local regulations at issue in this case. We have previously described RSA chapter 149-M as "an expansive solid waste management statute" that "calls upon the State, through the division of waste management, to conduct comprehensive solid waste planning and to regulate and enforce the State's solid waste laws." *Opinion of the Justices (Solid Waste Disposal)*, 135 N.H. at 545, 608 A.2d at 872. As noted above, however, and unlike the hazardous waste statutes found to preempt local action in *Stablex Corp. v. Town of Hooksett*, 122 N.H. 1091, 456 A.2d 94, *see* RSA ch. 147-A, 147-B, 147-C, 147-D (1996), RSA chapter 149-M provides for extensive local involvement in the management of solid waste. *See, e.g.*, Laws 1981, 566:1 (reaffirmed by Laws 1982, 37:1); RSA 149-M:10, IV, :13, :17-:19.

 With regard to landfill closures, however, no role is provided for local government. Rather, DWM alone is given the responsibility and authority to "[r]egulate the closure of all solid waste facilities by establishing closure standards and through administration of a permit system." RSA 149-M:3, IV-a. Under a separate provision, DWM has the responsibility and authority to

> [e]stablish minimum standards for closing all solid waste facilities according to type of waste disposed of, and establish state closure guidelines for all facility owners and operators which shall include, but not be limited to, monitoring, restoration, and correction and compliance procedures which may be necessary in the maintenance of a closed landfill facility.

RSA 149-M:8, IV(h) (1996). Pursuant to its rulemaking authority, DWM has promulgated comprehensive and detailed technical standards governing landfill closures. *See* N.H. ADMIN. RULES, Env-Wm 312, 2507. Given DWM's express authority to regulate landfill closures and the absence of any provision for local involvement, we conclude that RSA chapter 149-M places exclusive control of landfill closures in the State and its agencies.

■ "Towns are merely subdivisions of the State and have only such powers as are expressly or impliedly granted to them by the legislature." *Public Serv. Co. v. Town of Hampton*, 120 N.H. 68, 71, 411 A.2d 164, 166 (1980). "Local regulation is repugnant to State law when it expressly contradicts a statute or is contrary to the legislative intent that underlies a statutory scheme." *Id.; see also Appeal of Coastal Materials Corp.*, 130 N.H. 98, 105, 534 A.2d 398, 402 (1987). Any power that towns might have to regulate solid waste, *see, e.g.*, RSA 31:39(f) (1988), "cannot be exercised in a way that is inconsistent with State law." *Public Serv. Co. v. Town of Hampton*, 120 N.H. at 71, 411 A.2d at 166. We believe that local control over landfill closures would impede DWM's "exercise of its lawful authority and application of its expertise in a field where expertise is of critical importance." *Town of Salisbury v. New England Power Co.*, 121 N.H. 983, 985, 437 A.2d 281, 282 (1981). We therefore hold that the State has preempted local regulation of landfill closures.

■ The town argues that the use of the phrase "minimum standards" in RSA 149-M:8, IV(h) demonstrates that towns are free to apply their own regulations on top of State requirements. We disagree. RSA chapter 149-M is elsewhere not subtle in its recognition of the role of local government in solid waste management. We would therefore regard it as incongruous for the legislature to rely obliquely on the reference to "minimum standards" as establishing local control over closures. Rather, we believe these words were intended simply to encourage individuals responsible for closing solid waste facilities to surpass State requirements, and not to provide concurrent jurisdiction to localities.

■ Our finding of preemption extends to all local action that has the intent or effect of frustrating the State's authority to regulate landfill closures. *See Stablex*, 122 N.H. at 1102, 456 A.2d at 100. Looking at the specific regulations sought to be applied by the town in this case, we conclude that the requirement of obtaining exceptions and variances under the town's zoning ordinances and approval under the town health code would amount to an impermissible "veto power," *Vernet v. Town of Exeter*, 129 N.H. 34, 39, 523 A.2d 48, 51 (1986), over the State's exercise of its authority. Accordingly, we affirm the superior court's dismissal of the town's petition to the extent the town sought to subject the closure to local approval under its zoning and health ordinances.

■ A similar result must obtain with regard to those aspects of the site plan review process that would have the effect or intent of frustrating State authority. In particular, any attempt by the town

to condition site plan approval upon its own independent review of the adequacy of the protection afforded by BFI's proposal against groundwater contamination and harmful discharges, *see* RSA 674:44, II(a)(2), (3) (1996), must be viewed as frustrating the State's exclusive authority to regulate the technical aspects of landfill closure and hence preempted. "Nonexclusionary aspects of the town's site plan review process, however, remain unaffected." *Applied Chemical Technology v. Town of Merrimack*, 126 N.H. 45, 47, 490 A.2d 1348, 1349 (1985). "[L]ocal regulations relating to such matters as traffic and roads, landscaping and building specifications, snow, garbage, and sewage removal, signs, and other related subjects, to which any industrial facility would be subjected and which are administered in good faith and without exclusionary effect, may validly be applied" under the town's site plan review process. *Stablex*, 122 N.H. at 1104, 456 A.2d at 101.

The town sought to apply all aspects of its site plan review process to the landfill closure. We hold that the superior court erred in dismissing the town's petition insofar as it failed to permit the town to apply those aspects that are nonexclusionary. We therefore reverse this portion of the superior court's order and remand for a determination of what aspects of the town's site plan review process may validly be applied to BFI's closure of the landfill.

*Affirmed in part; reversed in part; remanded.*

All concurred.