Merrimack
No. 2004-847

BIO ENERGY, LLC *& a.*

v.

TOWN OF HOPKINTON

Argued: June 15, 2005
Opinion Issued: December 30, 2005

*Sheehan Phinney Bass + Green, P.A.*, of Manchester (*William J. Donovan & a.* on the brief, and *Mr. Donovan* orally), for the plaintiffs.

*Upton & Hatfield, LLP*, of Concord (*Russell F. Hilliard* and *Matthew R. Serge* on the brief, and *Mr. Hilliard* orally), for the defendant.

*New Hampshire Municipal Association*, of Concord (*Cordell A. Johnston* on the brief) as *amicus curiae*.

BRODERICK, C.J. The parties appeal decisions of the Superior Court (*Fitzgerald*, J.) pertaining to Bio Energy, LLC's proposed use of construction and demolition debris woodchips as a source of fuel in its co-generation facility, and a cease and desist order issued by the defendant Town of Hopkinton (town), regarding operation of the facility. We affirm in part, reverse in part, and remand.

## I

Since 1983, plaintiff Bio Energy, LLC (Bio Energy) has operated a wood co-generation facility in Hopkinton. The business involves the combustion of woodchips to generate steam and electricity. The electricity is sold to Public Service of New Hampshire and other utility companies. Because the facility is located in the town's Industrial M-1 zone, which does not expressly allow the use of wood co-generation, Bio Energy was required to obtain a variance from the town's zoning board of adjustment (ZBA) and site-plan approval from the planning board in order to construct and operate its facility.

In February 1983, Bio Energy appeared before the planning board for site plan approval. At the public hearing on Bio Energy's application, the issue of whether the facility would "always burn woodchips or at some point will [Bio Energy] want to burn pelletized tires" was raised. Bio Energy's representative stated that "they had talked about the possibility of burning rubber but the defin[i]te plan [was] to burn woodchips." The representative acknowledged that in any event, the company "would have to conform with air pollution standards." The board conditioned site plan approval for the facility upon Bio Energy's receipt of necessary State and

federal environmental permits. No separate condition was placed upon the source of the fuel to be used.

In March 1983, Bio Energy appeared before the ZBA to request a variance to construct and operate the wood co-generation facility. Discussions between Bio Energy and the ZBA focused upon the proper storage of the fuel source, not the source or nature of the fuel. In granting the variance, the ZBA did not place any limitation upon the source or nature of the wood fuel to be used.

Bio Energy's emissions are regulated by the Environmental Protection Agency (EPA) under the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, and by the New Hampshire Department of Environmental Services (DES) under the Air Pollution Control Act, RSA chapter 125-C (2005 & Supp. 2005), and the Air Toxic Control Act, RSA chapter 125-I (2005). In the 1990's, DES established the Title V permitting program, which places limitations on Bio Energy's facility, including on its fuel use and fuel mixtures.

Bio Energy has continually modified and adjusted its fuel source to respond to changing environmental regulations and economic conditions. Its use of construction and demolition woodchips (C & D woodchips) as a fuel source has increased over the years as a lower cost source of fuel. C & D woodchips are woodchip fuel prepared from wood that has been separated from other material following construction and demolition activities and then cleaned.

In December 2001, Bio Energy applied to the town's building inspector for a building permit to mechanize the delivery of C & D woodchips from the wood fuel storage area to the power plant. In submitting the building permit application, Bio Energy informed the town that it was doing the work so as to be able to use woodchips derived from C & D wood. The building permit was issued by the board of selectmen (selectmen) on December 10, 2001.

In January 2002, the town administrator sent a letter on behalf of the selectmen to Bio Energy supporting its plan to use C & D woodchips and requesting a meeting to establish whether Bio Energy could accept the town's C & D material. As the letter stated:

> Our office has been watching with great interest and we hope, also, helping in whatever way we could, your application for a Solid Waste Permit from the State of New Hampshire. As we understand the permit, this would enable BioEnergy to burn painted wood and plywood together with clean woodchips. The Board of Selectmen cordially extends an invitation to meet with them, and their Transfer Station Superintendent to discuss the

possibility of BioEnergy taking a percentage of our C & D and to negotiate a rate acceptable to both parties.

(Emphasis and ellipsis omitted.)

In July 2002, Bio Energy applied to the air resources division of DES for a modified Title V permit to allow it to burn up to 100% woodchips derived from C & D debris. Pursuant to DES permitting requirements, Bio Energy filed an application with the State for a permit to use C & D woodchips in its fuel mix. The permit program, overseen by the solid waste division of DES, regulates the quality of the C & D woodchips that enter the facility and the management of the woodchips prior to combustion.

In July 2003, after a review period that included public notice of the proposed revised permit and a public hearing in the town, DES issued a Title V permit allowing Bio Energy to burn C & D woodchips.

In September 2003, several residents of Hopkinton filed a petition with the selectmen requesting the issuance of a cease and desist order to prevent Bio Energy from utilizing C & D woodchips as a fuel source. Following a public hearing, the selectmen informed Bio Energy that they would issue a cease and desist order if Bio Energy did not apply to the ZBA or the planning board for a new permit, asserting that the 1983 variance did not contain allowance for "any factor such as significant lead or similar emissions into the air." The selectmen stated that "[t]he Town now has every reason to conclude . . . that the change in fuel constitutes a change in use and, therefore, the requirement to apply for a new permit."

In November 2003, the selectmen issued a cease and desist order to Bio Energy, which provided:

> Pursuant to RSA 676:17-a, you are hereby ordered to cease and desist from any activity in connection with the burning of construction or demolition debris at the Bio Energy facility in West Hopkinton, NH, and from any further activity pursuant to the building permit issued on December 10, 2001.
>
> As to the burning of construction or demolition debris, the Board [of Selectmen] determined, on October 7, 2003, that the existing variance issued for this facility in 1983 did not include within its scope the burning of construction or demolition debris, and thus any activity in this regard violates the Hopkinton Zoning Ordinance, which does not permit such a use in any zone. The corrective action required is a statement by you within seven (7) days to the effect that you will not undertake any such activities unless and until all necessary approvals and permits have been obtained.

In December 2003, Bio Energy filed a petition for declaratory and injunctive relief and damages against the town. Bio Energy sought: (1) a declaratory judgment that the town's cease and desist order was unlawful, that it was authorized to proceed with construction under its 2001 building permit, and that the legal doctrine of preemption barred the town from enforcing the zoning ordinance against Bio Energy's use of C & D woodchips; (2) a permanent injunction to prevent the town from regulating its use of C & D woodchips; (3) monetary damages based on the town's unconstitutional partial taking of its land; and (4) legal fees and costs associated with litigating the lawfulness of the cease and desist order. The town counterclaimed, asserting that Bio Energy's use of C & D woodchips as a fuel source constituted an impermissible change in use because it was beyond the scope of permitted uses allowed under the 1983 variance and was in violation of the town's zoning ordinance. In addition to seeking various findings, as well as attorney's fees and costs, the town sought injunctive relief in the form of an order directing Bio Energy to cease any operations involving the burning of C & D woodchips.

In March 2004, the trial court vacated the town's cease and desist order on the basis that the town lacked authority to issue it, and ruled that the change in use resulting from Bio Energy's use of C & D woodchips did not require the granting of a new variance. In April 2004, the trial court dismissed the town's counterclaim for injunctive relief and denied Bio Energy's request for permanent injunctive relief against the town. In October 2004, the trial court granted the town's motion to dismiss Bio Energy's takings claim. In November 2004, the trial court ruled that the issue of the construction and modification to Bio Energy's existing facility was not ripe for review because the town had not yet attempted to regulate any portion of Bio Energy's three-phase plan. These appeals followed.

After oral argument before this court, we became aware that DES may have revoked one of Bio Energy's operating permits and that the legislature had established a moratorium on the disposal of construction and demolition waste by incineration until July 1, 2006. We accordingly directed the parties to submit memoranda addressing whether any or all of the issues on appeal are ripe for judicial review and whether any or all of the issues on appeal are moot. The doctrine of mootness is designed to avoid deciding issues that "have become academic or dead." *Petition of Brooks*, 140 N.H. 813, 816 (1996) (quotation omitted). Our review of the parties' memoranda convinces us that, despite the moratorium, the case involves a "pressing public interest" and we will, therefore, resolve the legal issues presented. *See Royer v. State Dep't of Empl. Security*, 118 N.H. 673, 675 (1978).

## II

On appeal, the town argues that the trial court erred: (1) in ruling that it was preempted by State air emissions statutes from exercising control over local land use issues; and (2) in dismissing its claim that the use of woodchips derived from C & D debris as a fuel source constituted a change of use, thereby requiring Bio Energy to obtain new local permits. Bio Energy cross-appeals, arguing that the trial court erred: (1) in dismissing its claim of an unconstitutional taking and its request for attorney's fees and costs; and (2) by failing to rule on its claim that it had not acted outside the scope of the December 2001 building permit. We review these issues in order.

"The standard this court applies in reviewing a motion to dismiss is whether or not the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery." *LaRoche, Adm'r v. Doe*, 134 N.H. 562, 564 (1991). "[W]e take as true all facts well pleaded, and construe all reasonable inferences therefrom in the light most favorable to the nonmoving party." *Tilton v. Dougherty*, 126 N.H. 294, 296 (1985).

The town first argues that the trial court erred in ruling that it is preempted by State air emissions statutes, RSA chapter 125-C, from exercising control over land use issues; specifically, issuing a cease and desist order to prevent Bio Energy from operating its wood co-generation facility in a manner contrary to the variance it received from the town in 1983. Bio Energy argues that RSA chapter 125-C expressly reserved for the State the authority to regulate air emissions; that the statutory and regulatory scheme is detailed and comprehensive and on its face demonstrates the intent of the legislature to exclusively regulate the field of air quality control; and that the town's issuance of the cease and desist order based upon concerns regarding air emissions is directly contrary to the express provisions of RSA chapter 125-C and unlawfully attempts to regulate in a preempted field.

"The state preemption issue is essentially one of statutory interpretation and construction—whether local authority to regulate under a zoning enabling act is preempted by state law or policy." *N. Country Envtl. Servs. v. Town of Bethlehem*, 150 N.H. 606, 611 (2004) (quotation and ellipsis omitted). "Implied preemption may be found when the comprehensiveness and detail of the State statutory scheme evinces legislative intent to supersede local regulation." *Id.*

To determine whether a statutory scheme is comprehensive, the court looks to: whether the expressed purpose of the statute and the grant of regulatory authority evinces an intent to regulate the entire field in

question, *JTR Colebrook v. Town of Colebrook*, 149 N.H. 767, 769-71 (2003); the extent of the application process necessary to obtain a permit, *Arthur Whitcomb, Inc. v. Town of Carroll*, 141 N.H. 402, 406 (1996); whether the statute contemplates public hearings on any proposal affecting a municipality, *Applied Chemical Technology v. Town of Merrimack*, 126 N.H. 45, 49 (1985); the level of detail and technical specifics of the State's regulations, *Town of Pelham v. Browning Ferris Indus. of N.H.*, 141 N.H. 355, 364 (1996); and whether the agency has the authority to investigate and take action in response to regulatory violations, *Appeal of Coastal Materials Corp.*, 130 N.H. 98, 105-06 (1987).

The declaration of policy and purpose in RSA 125-C:1 provides:

> It is hereby declared to be the public policy of the state of New Hampshire and the purpose of this chapter to achieve and maintain a reasonable degree of purity of the air resources of the state so as to promote the public health, welfare, and safety, prevent injury or detriment to human, plant, and animal life, physical property and other resources, foster the comfort and convenience of the people, promote the economic and social development of this state and to facilitate the enjoyment of the natural attractions of the state.

The chapter contains twenty-one sections defining and establishing in detail a statewide permitting program to monitor ambient air quality throughout the State.

The statute establishes authority to develop a comprehensive regulatory and abatement program. It broadly regulates "[a]ir contaminant[s]," RSA 125-C:2, II, and "air pollution," RSA 125-C:2, III. It also grants the commissioner of DES extensive rule-making authority, RSA 125-C:4, and the authority to: (1) "develop[] a comprehensive program and provide services for the study, prevention, and abatement of air pollution," RSA 125-C:6, II; and (2) "[c]oordinat[e] and regulat[e] the air pollution control programs of political subdivisions of the state and enter [into] agreements with said subdivisions to plan or implement programs for the control and abatement of air pollution," RSA 125-C:6, XIII.

RSA 125-C:6, XIV requires the commissioner to establish and operate a statewide permitting system for the "construction, installation, operation or material modification of air pollution devices and sources." Pursuant to its rulemaking authority and the mandates of the Clean Air Act, 42 U.S.C. §§ 7401 *et seq.*, DES enacted the Title V permitting program to regulate the operation of any "major … source" of air emissions. RSA 125-C:11; N.H. ADMIN. RULES, Env-A 600 *et seq.*

The Title V permitting program reviews a facility's air emissions to ensure compliance with established ambient air levels for any regulated toxic air pollutant emitted by a regulated facility. RSA 125-I:5 (2005); N.H. ADMIN. RULES, Env-A 1400. Ambient air limits are set by DES in conjunction with the department of health and human services (DHHS) to restrict pollution and reduce human exposure to toxic air pollutants. *See* N.H. ADMIN. RULES, Env-A 1401.01. Bio Energy is required to demonstrate that its operations are within the maximum emissions limits set by DES and DHHS.

Additionally, the statute contains detailed criteria for the denial, suspension, revocation or modification of a permit, authorizing DES to investigate and take corrective action against operations not in compliance with the statute and regulations. RSA 125-C:13; RSA 125-C:6, XIV.

■ "Generally, a detailed and comprehensive State statutory scheme governing a particular field demonstrates legislative intent to preempt that field by placing exclusive control in the State's hands." *JTR Colebrook*, 149 N.H. at 770. "Such exhaustive treatment of the field ordinarily manifests legislative intent to occupy it." *N. Country Envtl.*, 150 N.H. at 615. We hold that RSA chapter 125-C constitutes a comprehensive and detailed regulatory scheme preempting the field of air pollution control in this State.

■ "It is well settled that towns cannot regulate a field that has been preempted by the State." *JTR Colebrook*, 149 N.H. at 770 (quotation omitted). "Even when a local ordinance does not expressly conflict with a State statute, it will be preempted when it frustrates the statute's purpose." *N. Country Envtl.*, 150 N.H. at 611; *see Wasserman v. City of Lebanon*, 124 N.H. 538, 542-43 (1984) (where State has enacted a comprehensive regulatory scheme, no local actions or ordinances will be allowed to contravene it).

The town argues that it "is not preempted from requiring Bio Energy to obtain a new variance prior to burning wood chips derived from C & D materials because the applicable legislation authorizes additional municipal regulation in the field of air emissions, and because the Town's actions are not repugnant to the letter or purpose of RSA Chapter 125-C." We do not agree that the cities and towns in this State have been given "concurrent affirmative authority" to regulate air pollution. *Stablex Corp. v. Town of Hooksett*, 122 N.H. 1091, 1101 (1982).

As the trial court ruled, RSA chapter 125-C

> does not contain any express authorization for local control over the creation of air policy throughout the state. Although the

> statute does contain some language indicating some degree of local involvement in creating air standards, such language is derived only through inference and indicates a minimal role, at most, for municipalities. Thus, to require Bio Energy to apply for a new variance in order to burn C & D debris, when Bio Energy has already been granted a Title V [permit] from [DES] to burn such debris would amount to granting the town an impermissible veto power over the ... Title V program and frustrates its purpose.

We agree with the trial court that "although various sections of [the statute] may encourage municipalities to participate in the rule making process," none of the specific statutory provisions referenced by the town support the conclusion "that the legislature intended to provide municipalities with the authority to interfere with air regulatory matters as the Town did here."

 "We regard it as highly improbable that the legislature, after establishing detailed guidelines," intended to leave the ultimate regulation of air pollution "to the vagaries of local regulation." *JTR Colebrook*, 149 N.H. at 771. It follows that the town had no authority to issue a cease and desist order based upon emissions produced by Bio Energy's operation of its co-generation facility. "Where the state has preempted the field, local law regulating the same subject is inconsistent with the state's transcendent interest, whether or not the terms of the local law actually conflict with the statewide legislation." *Id.* at 773 (quotation omitted). Of course, "[a]ny local regulations relating to such matters as traffic and roads, landscaping and building specifications, snow, garbage, and sewage removal, signs, and other related subjects, to which any industrial facility would be subjected and which are administered in good faith and without exclusionary effect, may validly be applied to a facility approved by the State." *Stablex Corp.*, 122 N.H. at 1104.

## III

The second issue raised by the town is whether the trial court erred in dismissing its claim that Bio Energy's use of woodchips derived from C & D debris constitutes a change in use from that permitted by the 1983 variance. The town argues that during the initial ZBA and planning board hearings, Bio Energy represented that its co-generation facility "was to use pure wood chips" as its fuel source, and that the subsequent change in fuel source "to a more dangerous, toxic substance departs from the nature and purpose of the prevailing nonconforming use and represents an illegal expansion of Bio Energy's operation."

██ "[A]n extension and enlargement that substantially changes the nature and purpose of the nonconforming use is impermissible." *Town of Salem v. Wickson*, 146 N.H. 328, 330 (2001). "The burden of establishing that the use in question is fundamentally the same use and not a new and impermissible one is on the party asserting it." *New London v. Leskiewicz*, 110 N.H. 462, 467 (1970).

> In deciding whether the particular activity is within the scope of the established or acquired nonconforming use consideration may be given to, among others, the following factors: (1) to what extent does the use in question reflect the nature and purpose of the prevailing nonconforming use; (2) is it merely a different manner of utilizing the same use or does it constitute a use different in character, nature and kind; [and] (3) does this use have a substantially different effect on the neighborhood.

*Id.* at 467-68. "The degree to which the original nature and purpose of the undertaking remains unchanged largely determines whether there has been a change in the preexisting use." *Id.* at 468.

The 1983 ZBA and planning board meeting minutes do not mention "pure woodchips." Bio Energy represented that it would burn "woodchips" and raised the possibility of burning rubber chips. In addition, neither the planning board nor the ZBA approvals imposed a condition upon the source or nature of the woodchips to be used as fuel in the co-generation facility. A court will not impose implied limitations upon a variance where no such limitation was imposed at the grant of the variance itself. *See N. Country Envtl. Servs.*, 146 N.H. at 353-54.

██ For the better part of the past twenty years, Bio Energy has utilized a fuel mix of woodchips from a wide range of waste wood sources. These have included waste wood from forestry and lumbering operations, and other waste woods such as shavings, sawdust, chipped pallets, chipped plywood, woodchips from C & D wood, and pulp chips. Bio Energy's increased use of woodchips derived from C & D materials is "merely a different manner of utilizing the same use," *i.e.*, wood co-generation. *See Leskiewicz*, 110 N.H. at 468. We hold that the use of woodchips from C & D materials does not substantially change the nature and purpose of the original use permitted by the 1983 variance.

## IV

Bio Energy raises three issues in its cross-appeal. First, Bio Energy asserts that "by overstepping its authority and regulating in a preempted field in a manner that deprived Bio Energy of an economically viable use of

its property, the Town 'abused its discretion' and acted in an 'arbitrary and unreasonable' manner," thereby resulting in an unconstitutional taking of Bio Energy's vested property rights. Bio Energy argues that the trial court erred in ruling that the town's conduct was the result of a mistaken, but not unreasonable or arbitrary, interpretation of Bio Energy's variance.

The New Hampshire Constitution provides that "no part of a man's property shall be taken from him ... without his own consent." N.H. CONST. pt. I, art. 12. "A 'taking' occurs when the application of a regulation to a particular parcel denies the owner an economically viable use of his or her land." *Smith v. Town of Wolfeboro*, 136 N.H. 337, 345 (1992). "[A]rbitrary or unreasonable restrictions which substantially deprive the owner of the economically viable use of his land in order to benefit the public in some way constitutes a taking within the meaning of our New Hampshire Constitution requiring the payment of just compensation." *Burrows v. City of Keene*, 121 N.H. 590, 598 (1981) (quotation omitted). However, "[e]rroneous board decisions based on mistaken interpretations of valid regulations differ materially from technically precise applications of invalid ordinances; a mistaken board decision does not effect a taking when the erroneous decision resulted from misconstruction of otherwise valid restrictions." *Dumont v. Town of Wolfeboro*, 137 N.H. 1, 10 (1993).

The trial court, in denying Bio Energy's takings claim, reasoned that "the Town did not create a new ordinance and permanently restrict Bio Energy from the use of its property. Rather, the Town issued the ... cease and desist order restricting Bio Energy from burning C & D debris ... because it believed that such activity was outside the scope of the variance that it issued to Bio Energy in 1983 and that such activity was injurious to the public." The court also noted that "Bio Energy has successfully opted on its right to petition the Court to review and reverse the Town's decision. ... In that regard, '[a]ny decrease in the value of the subject property that occurs during the pendency of governmental decision making [or appeals to the superior court] must be borne by the property owner and does not give rise to a compensable taking.'" (Quoting *Smith v. Town of Wolfeboro*, 136 N.H. at 346.)

 We agree with the trial court's ruling. Although the selectmen improperly issued the cease and desist order, given the lack of any controlling legal precedent at the time prohibiting the town from banning the burning of C & D debris, its actions were not arbitrary and unreasonable in the context of a takings analysis.

## V

Bio Energy next argues that the trial court erred by dismissing its request for attorney's fees and costs under RSA 676:17-a, VII (Supp. 2005). In its order of November 10, 2004, the trial court ruled that Bio Energy's petition to request injunctive, declaratory, monetary and other equitable relief was not ripe for review, thereby dismissing Bio Energy's claim for legal fees.

Pursuant to RSA 676:17-a, VII, when a cease and desist order is dismissed, the trial court "shall order the defendant's costs and reasonable attorneys fees to be paid by the municipality" if "it appears to the court that the order was frivolous, was commenced in bad faith, or was not based upon information and belief formed after reasonable inquiry or was not well-grounded in fact." Given that the record before us establishes that Bio Energy has, with the town's knowledge, utilized woodchips derived from C & D materials, as approved by the State and federal governments, for the better part of twenty years, and that the town actively sought to enter into an agreement whereby Bio Energy would burn the town's C & D debris, we reverse the dismissal of this issue and remand to the trial court. The issue whether Bio Energy is entitled to reasonable attorney's fees and costs associated with the town's issuance of the cease and desist order is "capable of being adjudicated on an adequately developed record," *Appeal of State Employees' Assoc.*, 142 N.H. 874, 878 (1998), and is, therefore, ripe for review.

## VI

Finally, we consider whether the trial court erred by failing to rule on Bio Energy's claim that it has not acted outside the scope of the December 2001 building permit. Bio Energy requested that the trial court rule whether the doctrine of preemption bars the town from regulating its three phase construction/modification plan for its co-generation facility. The town asserted that because Bio Energy had not submitted its plan for site plan review to the town's planning board or ZBA, no review has taken place to determine which, if any, local regulations are applicable to the project.

The trial court agreed with the town, concluding that because "the Town has not made any attempt to regulate any portion of Bio Energy's proposed three phase construction/modification plan, nor has Bio Energy demonstrated that any permit required by the Town would frustrate the State's authority to regulate solid waste or air emissions," Bio Energy's petition for relief was not ripe for review. As the trial court reasoned,

"[W]hether or not the Town is applying regulations that run counter to the applicable statutes, is an issue of law that can only be analyzed and determined after the Town has attempted to apply such regulations. Any order on the issues raised would constitute an advisory opinion which this Court may not give." We find no error.

*Affirmed in part; reversed in part; and remanded.*

NADEAU, DALIANIS, DUGGAN and GALWAY, JJ., concurred.