Grafton
No. 2003-337

## NORTH COUNTRY ENVIRONMENTAL SERVICES, INC.

v.

## TOWN OF BETHLEHEM & a.

Argued: January 7, 2004
Opinion Issued: March 1, 2004

*Brown, Olson & Wilson, P.C.*, of Concord (*Bryan K. Gould & a.* on the brief), and *Sheehan Phinney Bass + Green, P.A.*, of Manchester (*John E. Peltonen* on the brief and orally) for the plaintiff.

*Boutin & Associates, P.L.L.C.*, of Londonderry (*Brenda E. Keith* on the brief, and *Edmund J. Boutin* orally), for the defendants.

DALIANIS, J. This case concerns on-going litigation between the plaintiff, North Country Environmental Services, Inc. (NCES), and the defendants, the Town of Bethlehem and its planning and zoning boards (town). In 2001, we issued an opinion regarding prior litigation between NCES and the town. *See N. Country Envtl. Servs. v. Town of Bethlehem*, 146 N.H. 348 (2001) (*NCES I*). Like *NCES I*, the instant dispute arises out of NCES' landfill operations. The parties appeal the order of the Superior Court (*Burling*, J.) upon the merits of NCES' petition for declaratory relief and the town's counterclaims and counter-petition for declaratory relief. We affirm in part, reverse in part, vacate in part, and remand.

*I. Background*

*A. NCES I*

Since 1976, a private landfill has existed on an eighty-seven acre parcel in Bethlehem that NCES now owns. *See id.* at 350-51. The first landfill comprised four acres pursuant to a variance the town granted the original landowner in 1976. *See id.* at 350. In 1983, the landfill expanded to ten acres. *See id.* In 1985, the town granted a special exception to expand the landfill to an additional forty-one acres. *See id.* The town imposed twenty-

three conditions upon the special exception. *See id.* The expansion of the landfill has been a source of litigation since 1986.

NCES and its predecessors-in-interest have sought State permits to expand the landfill operations in stages within the fifty-one acres (the original ten acres and the forty-one acres that were the subject of the special exception). *See* N.H. ADMIN. RULES, Env-Wm 102.159. Stage I involved eighteen of the fifty-one acres. *See NCES I*, 146 N.H. at 351. The State granted permission for Stage I in 1987. *See id.* Stage II involved an additional seven acres. *See id.* The State granted permission for Stage II in 1989. *See id.* Stage II included two phases. *See* N.H. ADMIN. RULES, Env-Wm 102.124.

*NCES I* concerned the town's efforts to enjoin the second phase of Stage II. *See NCES I*, 146 N.H. at 351. The town relied, in part, upon the 1976 variance and the 1985 special exception. *Id.* at 352. We affirmed the trial court's ruling that the 1976 variance contained "no limitation on the area NCES' land filling operations could occupy on the ten-acre lot." *Id.* at 353-54. We also affirmed the court's determination that "neither the 1985 special exception, nor the 1986 conditions attached thereto, contain[ed] any express limitation on the size of the landfill." *Id.* at 355. Thus, we held that NCES had town approval to use fifty-one acres, the entire area encompassed by the 1976 variance and 1985 special exception, for its landfill operations. *See id.* at 353-55.

The town also relied upon two amendments to the town's zoning ordinance. *See id.* at 350-51. The first amendment, enacted in 1987, prohibits the existence of any private solid waste disposal facility in any town district. *See id.* at 350. The second amendment, enacted in 1992, prevents the location of any solid waste disposal facility or the expansion of an existing landfill in any district, unless the town owns the facility. *See id.*

We affirmed the lower court's determination that the town could not rely upon these amendments to enjoin Stage II, phase two. *See id.* at 352-53. Although NCES argued that the State Solid Waste Management Act, RSA chapter 149-M, preempted these amendments, we did not reach this issue. *See id.* at 353. Instead, we affirmed the trial court's ruling that neither amendment applied to NCES' operations on the fifty-one acres because the operations "were pre-existing, permitted uses at the time of the 1987 amendment." *Id.*; *see also* RSA 674:19 (1996). Because the amendments did not apply to NCES' operations on the fifty-one acres, it was unnecessary for us to decide whether State law preempted them. *NCES I*, 146 N.H. at 353.

The current litigation puts the issue of State law preemption under RSA chapter 149-M squarely before the court.

## B. Current Litigation

The current dispute primarily relates to actions NCES and the town took while *NCES I* was pending. During that time:

(1) NCES applied for and received a State permit to begin Stage III of the expansion, which involved additional land within the fifty-one acres. Stage III operations began in December 2000.

(2) NCES entered into a lease with Commonwealth Bethlehem Energy, LLC (CBE) to construct and operate a landfill gas utilization (LGU) facility on the fifty-one acres. *See* N.H. ADMIN. RULES, Env-Wm 2502.02(a)(6), 2506.07 (lined landfills must have decomposition gas control system). CBE received a temporary State permit to build the LGU facility, which is currently operational.

(3) The town notified NCES that it could not expand its landfill without first obtaining site-plan review and building permits from the town. Because of the *NCES I* litigation, however, the town did not initiate enforcement proceedings.

(4) The town notified CBE that it could not construct the LGU facility without a building permit and prior site approval. The town also asserted that the LGU facility violated a 1986 town ordinance prohibiting incinerators.

(5) In 2000 and 2001, the town amended its zoning laws to limit the height of "solid waste disposal facilit[ies]" to no more than ninety-five feet "measured from the natural and undisturbed contour of the land under any existing or future landfill."

In September 2001, NCES petitioned the trial court for, among other things, declarations that: (1) the town is precluded from exercising its site-plan review authority over and applying its height ordinance to the landfill's development within the fifty-one acre parcel; and (2) the town's height ordinance and site plan review regulations are preempted by RSA chapter 149-M.

The town counterclaimed for breach of contract and violation of certain of the conditions of the 1985 special exception. Additionally, the town sought a declaration that, with respect to Stage III and the LGU facility, NCES must bring a site plan to the planning board and, if the plan is approved, must then obtain a building permit.

After the instant lawsuit was filed, in April 2002, NCES applied for a State permit to develop Stage IV of the landfill. Nearly all of Stage IV involves land outside of the fifty-one acres. That same month, the town amended its counter-petition to seek the following declarations: (1) the part of Stage IV that expands beyond the fifty-one acres addressed in

*NCES I* is prohibited by the town's zoning ordinances, including the 1987 and 1992 amendments; and (2) prior to continuing to seek State approval for Stage IV, NCES must apply for and obtain "all local approvals." NCES received State permission for Stage IV in March 2003.

### C. Trial Court's Ruling

Following a four-day bench trial, the court issued a lengthy order on the merits of the parties' petitions. The court made the following rulings regarding the town's zoning ordinances: (1) the 1987 zoning amendment is preempted by RSA chapter 149-M because it is inconsistent with the State legislative scheme; (2) the 1992 zoning amendment is not preempted by RSA chapter 149-M and may be used by the town to prohibit expansions of the landfill beyond the fifty-one acres; (3) because the town's 1986 ordinance forbidding incinerators is preempted by the State Air Pollution Control Act, RSA chapter 125-C, the town may not apply it to the LGU facility; and (4) the town may apply its height ordinance to any development of the landfill within the fifty-one acres, including Stage III and portions of Stage IV.

With respect to the town's building permit and site-plan review requirements, the court ruled that: (1) portions of a town's site-plan review process are preempted by RSA chapter 149-M, while others are not; (2) the town may apply the non-preempted portions of the site-plan review process to all landfill construction that has taken place after Stage II, phase two; and (3) because the landfill is a permitted use within the fifty-one acres and because its form is regulated by the State, the town may not require NCES to obtain a building permit to expand the landfill, but may require it to obtain a building permit to build specific structures, such as the LGU facility, on the landfill.

Finally, the court ruled that only two of the conditions of the 1985 special exception that the town asserted NCES had violated were enforceable. Neither NCES nor the town has appealed this ruling.

## II. Discussion

### A. State Law Preemption

On appeal, NCES asserts that RSA chapter 149-M preempts the entire field of solid waste management facility regulation, except as set forth in RSA 149-M:9, VII (Supp. 2003), which NCES argues permits only local regulation of facility location. Accordingly, NCES contends that RSA chapter 149-M preempts the 1992 zoning amendment, the height ordinance, the town's entire site-plan review process and its building

permit requirement. The town counters that, as the trial court ruled, RSA chapter 149-M preempts only certain aspects of solid waste management facility regulation.

### 1. General Principles

 "The state preemption issue is essentially one of statutory interpretation and construction—whether local authority to regulate under a zoning enabling act . . . is preempted by state law or policy." 3 A.H. RATHKOPF & a., RATHKOPF'S THE LAW OF ZONING AND PLANNING § 48.2 (2003). Preemption may be express or implied. *See id.* §§ 48.2, 48.4, at 48-5 to 48-6; *cf. Koor Communication v. City of Lebanon,* 148 N.H. 618, 620 (2002) (discussing preemption of State law by federal law). Express preemption is not claimed here. Implied preemption may be found when the comprehensiveness and detail of the State statutory scheme evinces legislative intent to supersede local regulation. *See* 3 RATHKOPF, *supra* § 48.4, at 48-6. State law preempts local law also when there is an actual conflict between State and local regulation. *See id.* A conflict exists when a municipal ordinance or regulation permits that which a State statute prohibits or vice versa. 5 E. MCQUILLIN, MUNICIPAL CORPORATIONS § 15.20, at 107 (3d ed. rev. 1996). Even when a local ordinance does not expressly conflict with a State statute, it will be preempted when it frustrates the statute's purpose. *Id.*

 "The mere fact that a state law contains detailed and comprehensive regulations of a subject does not, of itself, establish the intent of the legislature to occupy the entire field to the exclusion of local legislation." 6 E. MCQUILLIN, MUNICIPAL CORPORATIONS § 21.34, at 335 (3d ed. rev. 1998); *see JTR Colebrook v. Town of Colebrook,* 149 N.H. 767, 770 (2003). To determine whether the legislature has intended to occupy the field, the court may look to the whole purpose and scope of the legislative scheme and need not find such intent solely in the statutory language. 6 MCQUILLIN, *supra* § 21.34, at 335. "[T]he very nature of the regulated subject matter may demand exclusive state regulation to achieve the uniformity necessary to serve the state's purpose or interest." *Id.* at 336.

> [T]he following questions are pertinent in determining whether the state has preempted the field: does the ordinance conflict with state law; is the state law, expressly or impliedly, to be exclusive; does the subject matter reflect a need for uniformity; is the state scheme so pervasive or comprehensive that it precludes coexistence of municipal regulation; and does the ordinance stand

as an obstacle to the accomplishment and execution of the full purposes and objectives of the legislature.

*Id.* at 335-36. When the State has preempted the entire regulatory field, *any* local law on the subject is preempted, regardless of whether the terms of the local and State law conflict. *See id.* at 334-35; *see also Casico v. City of Manchester*, 142 N.H. 312, 315 (1997).

### 2. Comprehensiveness of State Statutory Scheme

The legislature has declared the subject matter of RSA chapter 149-M to be of statewide concern. The purposes of the law are to "protect human health, . . . preserve the natural environment, and . . . conserve precious and dwindling natural resources." RSA 149-M:1 (Supp. 2003). Another purpose is to "ensure benefit to the citizens of New Hampshire by providing for solid waste management options which will meet the capacity needs of the state while minimizing adverse environmental, public health and long-term economic impacts." RSA 149-M:11, II (Supp. 2003).

The means to achieve these goals is "proper and integrated management of solid waste." RSA 149-M:1. The legislature has designated the State Department of Environmental Services (DES) to be responsible for enforcing RSA chapter 149-M. RSA 149-M:5 (Supp. 2003); *see also* RSA 149-M:4, V (Supp. 2003). Among other solid waste management responsibilities, DES must establish State solid waste management policies and goals, regulate private and public facilities by administering a State permit system, and prepare a statewide solid waste plan. RSA 149-M:6 (Supp. 2003).

A State permit is required before one constructs, operates or initiates the closure of a solid waste management facility. RSA 149-M:9 (Supp. 2003). DES may not issue a permit unless it determines that the proposed solid waste facility provides "a substantial public benefit." RSA 149-M:11, III (Supp. 2003). In making this determination, DES must consider, among other things: (1) "[t]he short- and long-term need for a solid waste facility of the proposed type, size, and location to provide capacity to accommodate solid waste generated within the borders of [the State]"; and (2) "[t]he ability of the proposed facility to assist the state in achieving" its goals, the goals of the State solid waste management plan, and the goals of one or more solid waste management plans submitted by local districts. *Id.*

In enacting the "substantial public benefit" requirement, the legislature found that: (1) the legislature "is responsible to provide for the solid waste management need[s] of the state and its citizens"; (2) "to provide for these needs, [the legislature] must ensure that adequate capacity exists within

the state to accommodate the solid waste generated within the borders of the state"; (3) "[f]acilities necessary to meet state solid waste capacity needs must be designed and operated in a manner which will protect the public health and the state's natural environment"; (4) "[a]n integrated system of solid waste management requires a variety of types of facilities to accommodate the entire solid waste stream"; and (5) enacting statutes to address these needs "is an exercise of the police power granted to the general court" under the State Constitution. RSA 149-M:11, I (Supp. 2003).

Although the purposes of RSA chapter 149 relate to State goals and policy, the law gives local government a role in solid waste management. *See Town of Pelham v. Browning Ferris Indus. of N.H.*, 141 N.H. 355, 359 (1996) (interpreting prior law). For instance, before issuing a State permit, DES must consider "[t]he concerns of the citizens and governing bodies of the host municipality, county, and district and other affected persons." RSA 149-M:11, IV(a) (Supp. 2003). In certain circumstances, DES must take testimony at a public hearing from local residents about their concerns. *See id.*

In enacting the chapter, the legislature found that "[t]he process of disposal of solid waste has been and should continue to be primarily the responsibility of municipal government." Laws 1996, 251:1. The legislature also found that "[a]lthough municipalities have primary responsibility for solving the problems of solid waste disposal, solutions should not only be based on individual municipal needs, but should include environmentally safe and economical answers which involve more than one community." *Id.*

RSA chapter 149-M requires every municipality to "either provide a facility or assure access to another approved solid waste facility for its residents." RSA 149-M:17, I (Supp. 2003); *see also* RSA 149-M:23-:25 (Supp. 2003). If the municipality does not meet this obligation, DES will investigate the opportunities for the municipality to build its own facility, use another municipality's facility, or contract with a private facility. RSA 149-M:21, I (Supp. 2003). If DES and the municipality are unable to agree upon an acceptable solution, and DES determines that land must be taken, DES "shall institute eminent domain proceedings." RSA 149-M:21, II-V (Supp. 2003).

Additional provisions of RSA chapter 149-M provide for State enforcement of the chapter through investigations and State-imposed penalties for non-compliance and violations. *See* RSA 149-M:13-:16 (Supp. 2003).

### 3. Comprehensiveness of Regulatory Scheme

RSA 149-M:7 (Supp. 2003) grants DES broad authority to adopt rules necessary to enforce RSA chapter 149, including those governing the criteria for all types of solid waste management facilities and those related to the State permit system. *See* RSA 149-M:7, II, III, XV; *see also Town of Pelham*, 141 N.H. at 362 (*interpreting prior law*).

Pursuant to DES regulations, *all* solid waste management facilities, including those exempt from the State permit requirement, must meet universal siting, design, construction, operation and closure standards. *See* N.H. ADMIN. RULES, Env-Wm 101.02(c), 2701.02. Each type of facility is also subject to a host of additional requirements. *See* N.H. ADMIN. RULES, Env-Wm. ch. 2100 (collection, storage and transfer facilities); N.H. ADMIN. RULES, Env-Wm. ch. 2200 (processing and treatment facilities); N.H. ADMIN. RULES, Env-Wm. ch. 2300 (composting facilities); N.H. ADMIN. RULES, Env-Wm. ch. 2400 (incineration facilities); N.H. ADMIN. RULES, Env-Wm. ch. 2500 (landfills).

Each of the landfill-specific requirements is set forth in abundant detail. *See* N.H. ADMIN. RULES, Env-Wm ch. 2500. For instance, the siting regulations include the following setback requirements:

> (a) There shall be a minimum 100-foot buffer strip between the property line and the footprint of the landfill.
> (b) There shall be a minimum 300-foot buffer between the footprint of the landfill and Class I and Class II roads and a minimum 100-foot buffer between the footprint of the landfill and Class III through Class VI roads.
> (c) There shall be a minimum distance of 500 feet maintained between the footprint of the landfill and all existing residences not owned by the applicant.
> (d) The footprint of a landfill receiving putrescible wastes shall not be located within 10,000 feet of any airport runway used by turbojet aircraft or 5,000 feet of any airport runway used by only piston-type aircraft.

N.H. ADMIN. RULES, Env-Wm 2504.04. Additional siting requirements pertain to ground water, surface water and geologic conditions. *See* N.H. ADMIN. RULES, Env-Wm 2504.02, 2504.03, 2504.05. The regulations require, for example, that the base of the bottom liner system of a lined landfill "shall be a minimum of 6 feet above the seasonal high groundwater table and confirmed bedrock surface." N.H. ADMIN. RULES, Env-Wm 2504.02(d). In addition, the footprint of a landfill may not be located within

"200 feet upgradient and 100 feet downgradient of a wetland" or "within 200 feet of any perennial surface water body, measured from the closest bank of a stream and closest shore of a lake." N.H. ADMIN. RULES, Env-Wm 2504.03(d), (e).

The design regulations are equally detailed. For instance, an applicant must show that the materials used for the subgrade of a landfill "have a saturated hydraulic conductivity of $1 \times 10^{-4}$ cm/sec or less." N.H. ADMIN. RULES, Env-Wm 2505.03(b). Other design requirements include: (1) designing and maintaining main access roads leading to and from the working face of the landfill so that they support the required loading and limit traffic congestion, road safety hazards and dust production; (2) fencing main access roads onto/into the property "if necessary to catch blowing paper"; and (3) designing final grades to "blend with surrounding features to the greatest extent possible." N.H. ADMIN. RULES, Env-Wm 2505.11(g), (h), (j).

Similarly, the operating regulations specify the inspections and maintenance that a landfill permittee must perform daily or weekly. *See* N.H. ADMIN. RULES, Env-Wm 2506.08.

Each applicant must submit a site report to DES that includes, among other things: maps and a narrative discussion of the facility's impact on flood hazard zones, wetlands, water sources and endangered species; a hydrogeological report of the site if the facility has managed or will manage waste which has the potential to cause groundwater or surface water contamination; and discussion of anticipated traffic impacts by the facility. N.H. ADMIN. RULES, Env-Wm 314.10.

██ We hold that RSA chapter 149-M constitutes a comprehensive and detailed regulatory scheme governing the design, construction, operation and closure of solid waste management facilities. Such exhaustive treatment of the field ordinarily manifests legislative intent to occupy it. *See Arthur Whitcomb, Inc. v. Town of Carroll*, 141 N.H. 402, 407 (1996); *cf. Koor Communication*, 148 N.H. at 621 (federal regulations have same preemptive force as federal statutes).

Our conclusion that RSA chapter 149-M is comprehensive and detailed does not end our preemption inquiry, however, because one of its provisions, RSA 149-M:9, VII, authorizes additional municipal regulation. *See Casico*, 142 N.H. at 316. The parties dispute the scope of municipal regulation that RSA 149-M:9, VII allows.

### 4. Additional Municipal Regulation Under RSA 149-M:9, VII

We first scrutinize the language used in RSA 149-M:9, VII. *See JTR Colebrook*, 149 N.H. at 770. We give undefined language its plain and ordinary meaning, keeping in mind the legislation's intent, which is determined by examining the construction of the statute as a whole, and not simply by examining isolated words and phrases. *Id.* We must construe this statutory provision in a manner that is "consistent with the spirit and objectives of the legislation as a whole." *Id.* at 770-71 (quotation omitted). We do not look beyond the language of a statute to determine legislative intent if the language is clear and unambiguous. *See Pennelli v. Town of Pelham*, 148 N.H. 365, 368-69 (2002).

RSA 149-M:9, VII provides:

> The issuance of a facility permit by the department shall not affect any obligation to obtain local approvals required under all applicable, lawful local ordinances, codes, and regulations not inconsistent with this chapter. Local land use regulation of facility location shall be presumed lawful if administered in good faith, but such presumption shall not be conclusive.

▮ A plain reading of the statute is that RSA chapter 149-M does *not* preempt lawful, applicable local regulations that are consistent with State law. The first sentence of this provision requires State permit applicants to obtain approvals under "all applicable, lawful" local regulations that are consistent with RSA chapter 149-M. The second sentence clarifies that the lawfulness of local land use regulation of facility location will be presumed when it is administered in good faith.

NCES reads the reference in the first sentence to "all applicable, lawful local ordinances, codes, and regulations" in context with the reference in the second sentence to "[l]ocal land use regulation of facility location," and concludes that a private solid waste facility may be subject only to local regulation of facility location. Read this way, the statute permits a municipality only to regulate where a solid waste facility may be located.

We reject NCES' interpretation as unreasonable. NCES' interpretation requires that we ignore the legislature's use of the word "all" in reference to local ordinances, codes and regulations. We can neither delete language from a statute nor add words that the legislature did not see fit to include. *See Appeal of Baldoumas Enters.*, 149 N.H. 736, 739 (2003).

Were it not for this provision, we would agree with NCES that RSA chapter 149-M completely preempts the field of solid waste management regulation. The State's legislative and regulatory framework is pervasive

and comprehensive and the very nature of the subject it addresses, solid waste, requires state regulation to "achieve the uniformity necessary to serve the state's purpose." 6 McQUILLIN, *supra* § 21.34, at 335-36. In RSA chapter 149-M, the legislature has provided a regulatory framework for coordinating solid waste management statewide and for ensuring that the State's solid waste management needs will be met.

■ The comprehensiveness and detail of the State scheme dictates that we construe RSA 149-M:9, VII narrowly. We hold that the phrase "not inconsistent with this chapter," read in the context of the entire legislative scheme, means not only that the regulation complies with the letter but also with the spirit of RSA chapter 149-M. RSA 149-M:9, VII. Given the breadth of the State regulatory scheme and the important State purpose it seeks to achieve, local regulation cannot "amount to an impermissible veto over the State's exercise of its authority." *Town of Pelham*, 141 N.H. at 363 (quotation and citation omitted). As required by the spirit and objectives of RSA chapter 149-M, State law preemption of local regulation of solid waste management facilities must be the norm, not the exception. Accordingly, when evaluating whether a particular local regulation conflicts with the State scheme, courts should err on the side of finding State law preemption, unless the local regulation concerns where, within a town, a facility may be located.

### 5. Preemption of Town Regulation of Development Outside Fifty-One Acres

We next examine whether applying the town's height ordinance, building permit requirement, 1992 zoning amendment and site plan review regulations to the portion of Stage IV that is outside of the fifty-one acres is consistent with RSA chapter 149-M.

#### a. Building Permit and Height Ordinance

■ We agree with the trial court that the town may not require NCES to obtain a building permit before constructing the portion of Stage IV that falls outside of the fifty-one acres. As the trial court aptly ruled, and as the town concedes, the landfill's structure, which includes its footprint, content and final grade slope, is regulated exclusively by DES. For this reason, we also hold that it would frustrate the intent of RSA chapter 149-M for the town to apply its height ordinance to the landfill's development. *See Casico*, 142 N.H. at 317 (local regulation preempted when it has either effect or intent of frustrating the State regulatory authority). We are not persuaded by the trial court's determination that

height is unrelated to a landfill's footprint, stability and volume. We believe that height is integrally related to a landfill's capacity, which is regulated exclusively by DES.

### b. 1992 Zoning Amendment

■ We hold that RSA chapter 149-M does not facially preempt the 1992 zoning amendment. The amendment conflicts with neither the terms of RSA chapter 149-M nor its spirit. It does not prohibit that which RSA chapter 149-M permits or vice versa. See 5 MCQUILLIN, supra § 15.20, at 107. Indeed, as the trial court noted, the 1992 amendment reflects "the choice a town is permitted to make under the general parameters of municipal responsibility established in RSA 149-M:17[, I]." See also RSA 149-M:23-:25.

We further hold that RSA chapter 149-M does not preempt the amendment as applied to the portion of Stage IV that is beyond the fifty-one acres. The town currently complies with RSA chapter 149-M by granting its residents access to NCES' landfill. See RSA 149-M:17, I; see also RSA 149-M:23-:25. Under these circumstances, it does not violate RSA chapter 149-M for the town to prohibit development of the portion of Stage IV that falls outside of the fifty-one acres. We agree with the trial court that, with the 1992 amendment, the town has not exempted itself from its obligation to partake in the State plan of integrated solid waste management. The amendment indicates that, in the future, presumably when there is no additional capacity in NCES' landfill on the fifty-one acres, the town will either provide its own facility or assure its residents access to another approved facility. See RSA 149-M:17, I; see also RSA 149-M:23-:25. We express no opinion as to whether future applications of the 1992 zoning amendment may be inconsistent with RSA chapter 149-M.

NCES asserts that the 1992 amendment as applied to Stage IV is inconsistent with RSA chapter 149-M. As NCES observes, when granting the permit, DES had to have determined that there was a "need for a solid waste facility of the proposed type, size, and location to provide capacity to accommodate solid waste generated within the borders of [the State]." RSA 149-M:11, III(a). Thus, NCES argues, the town should not be permitted to rely upon the 1992 amendment to prohibit development of Stage IV. To the contrary, RSA 149-M:9, VII required NCES to comply with "all applicable, lawful local ordinances, codes, and regulations not inconsistent with" RSA chapter 149-M before it obtained a State permit to construct the portion of Stage IV falling outside of the fifty-one acres. It cannot now rely upon the State permit to argue that the town ordinances with which RSA 149-M:9, VII mandated it comply are preempted.

NCES maintains that the 1992 amendment is an unlawful exercise of zoning authority. *See* RSA 672:1, III (1996); RSA ch. 674. Specifically, NCES argues that the amendment is improper because it distinguishes between users of land, not uses of land, *see Vlahos Realty Co. v. Little Boar's Head District*, 101 N.H. 460, 463-64 (1958), and because it contravenes the general welfare of the region it affects, *see Britton v. Town of Chester*, 134 N.H. 434, 441 (1991). As the trial court did not address these arguments and as resolving them might require additional factual findings, we remand them to the trial court for resolution in the first instance.

NCES further contends that the 1992 amendment is invalid because: (1) it improperly discriminates between town-owned and privately-owned landfills in violation of the State Equal Protection Clause, *see* N.H. CONST. pt. I, arts. 2, 12; and (2) applying the amendment to Stage IV is an arbitrary and unreasonable restriction upon NCES' property rights as guaranteed by Part I, Article 2 of the State Constitution.

The town counters that NCES failed to preserve these constitutional challenges. NCES asserts that it raised its constitutional claims as defenses to the town's counter-claims. NCES, however, has not provided us with its responsive pleading to the town's counter-claims. While the parties agree that NCES made constitutional arguments in its trial memorandum, they disagree as to what NCES argued.

It is a long-standing rule that parties may not have judicial review of matters not raised in the forum of trial. *Reynolds v. Cunningham, Warden*, 131 N.H. 312, 314 (1988). NCES bears the burden of demonstrating that it raised its constitutional claims before the trial court. *See id.* It also has the burden of providing the court with a record sufficient to decide its issues on appeal. *See Rix v. Kinderworks Corp.*, 136 N.H. 548, 553 (1992); *see also* SUP. CT. R. 13. Because NCES has failed to demonstrate that it preserved its constitutional claims for appellate review, we decline to review them.

### c. Site Plan Review

We are unable to determine whether the town's site plan regulations as applied to portions of Stage IV are consistent with RSA chapter 149-M because neither party has provided them to us. *See Wolters v. Am. Republic Ins. Co.*, 149 N.H. 599, 604 (2003); *see also* SUP. CT. R. 13. We observe that the trial court's ruling with respect to site plan review does not address the town's existing regulations, but instead generally discusses the interplay between RSA chapter 149-M and the site plan review regulations that a town *may* adopt under RSA 674:44 (1996). It

appears that the trial court may have rendered an advisory opinion as to actions the town could take in the future. *See Piper v. Meredith,* 109 N.H. 328, 330 (1969) (superior court has no jurisdiction to give advisory opinions). We vacate and remand for a determination as to whether the town's *existing* site plan regulations are applicable, lawful and consistent with RSA chapter 149-M. To be lawful, the town must have applied the regulations in "good faith and without exclusionary effect." *Stablex Corp. v. Town of Hooksett,* 122 N.H. 1091, 1104 (1982); *see also Town of Pelham,* 141 N.H. at 364. "Applicable" regulations are those "to which any industrial facility would be subjected." *Stablex,* 122 N.H. at 1104; *see also Town of Pelham,* 141 N.H. at 364.

We observe that the town has not appealed the trial court's determination that RSA chapter 149-M preempts the following types of site plan review regulations: (1) regulations related to drainage, flooding and protection of groundwater; (2) regulations related to smoke, soot and particulate discharge; and (3) regulations related to odor. Thus, for the purposes of the trial court's review on remand, the court need not review the town's site plan regulations related to these areas, to the extent that any such regulations exist.

### 6. Town Regulation of Landfill Within Fifty-One Acres

#### a. Site Plan Review

Because the trial court misapplied the law of res judicata, we reverse its ruling that the town may subject Stage III and the portion of Stage IV that lies within the fifty-one acres to site plan review. Res judicata, or claim preclusion, bars relitigation of any issue that was or might have been raised with respect to the subject matter of the prior litigation. *Appeal of Univ. System of N.H. Bd. of Trustees,* 147 N.H. 626, 629 (2002). The essence of the doctrine is that a final judgment by a court of competent jurisdiction is conclusive upon the parties in a subsequent litigation involving the same cause of action. *Brzica v. Trustees of Dartmouth College,* 147 N.H. 443, 454 (2002).

For the doctrine to apply, three elements must be met: (1) the parties must be the same or in privity with one another; (2) the same cause of action must be before the court in both instances; and (3) a final judgment on the merits must have been rendered on the first action. *Id.* The term "cause of action" means the right to recover and refers to all theories on which relief could be claimed arising out of the same factual transaction. *Radkay v. Confalone,* 133 N.H. 294, 297 (1990).

The doctrine applies to declaratory judgment proceedings. *See id.* "Where a plaintiff seeks a declaratory judgment, he is not seeking to enforce a claim against the defendant, but rather a judicial declaration as to the existence and effect of a relation between him or her and the defendant." *Id.* at 298 (quotation and brackets omitted). The grant of a declaration "conclusively settles the issues presented to the trial court regarding the parties' rights." *Id.*

In *NCES I*, the trial court granted NCES' request for declarations that: (1) it has all local approvals necessary to conduct landfill operations on the fifty-one acre parcel; and (2) it may continue to develop, construct and operate the landfill within the fifty-one acre parcel. *See NCES I*, 146 N.H. at 351 ("The [trial] court ruled that, pursuant to the 1976 variance and the 1985 special exception, NCES could expand its landfill uses through the ten-acre and forty-one acre parcels of the original eighty-seven-acre tract.").

The superior court in the current litigation ruled that these declarations were not dispositive, holding that "the language of the [c]ourt in the final judgment controls, not the language of the pleading, irrespective of whether the action sought in the petition is granted." The trial court relied exclusively upon the narrative order of the superior court in *NCES I* to determine what was actually litigated or could have been litigated in that lawsuit. It ruled that it was immaterial that the lower court in *NCES I* had granted certain of NCES' requests for declarations. This was error. To the contrary, the declarations NCES obtained were conclusive of the "existence and effect" of the relationship between the parties with respect to NCES' landfill on the fifty-one acres. *See Radkay*, 133 N.H. at 298. In *NCES I*, the parties actually litigated whether NCES had "all local approvals" necessary for expanding the landfill within the fifty-one acres and whether NCES could continue to develop, construct and operate its landfill on the fifty-one acres. *See NCES I*, 146 N.H. at 351. Accordingly, res judicata bars the town from requiring additional local approvals before NCES may construct Stage III and the portion of Stage IV of the landfill that falls within the fifty-one acres.

### b. Building Permit for LGU Facility

The trial court ruled NCES was required to obtain a building permit for the LGU facility "subject to the understanding of the Town that the LGU [facility] is not an incinerator, and that the allowable particulate matter released into the air is a preempted issue."

On appeal, NCES briefly contends that the State Air Pollution Control Act, RSA chapter 125-C, preempts not only how much particulate matter may be released into the air, but also any local building permit requirements related to design, installation, construction, modification or operation of emission systems, such as the LGU facility. RSA chapter 125-C, unlike RSA chapter 149-M, contains no provision authorizing additional municipal regulation. The town cursorily notes that the temporary permit issued for the LGU facility states that receipt of the temporary permit does not exempt CBE from "the need to secure all other required approvals to construct and operate the proposed facility, including those associated with applicable federal, state and local requirements." Ordinarily, we would not remand a question of law to the trial court to resolve in the first instance. *See Shannon v. Foster*, 115 N.H. 405, 407 (1975). We do so in this case *only* because we believe that the scope of preemption under RSA chapter 125-C is an important issue and because the parties have not fully subjected it to the crucible of adversary proceedings.

*B. Cross-Appeal*

In its cross-appeal, the town purports to challenge the trial court's determination that State law preemption precludes the town from applying its 1986 zoning ordinance prohibiting incinerators to the LGU facility. The trial court ruled that the State Air Pollution Control Act, RSA chapter 125-C, preempted the 1986 ordinance's application to the LGU facility. Without explanation, the town argues that the trial court should have instead examined whether RSA chapter 149-M preempted applying the ordinance to the LGU facility. As the town has not contested the trial court's ruling regarding preemption of the 1986 ordinance by RSA chapter 125-C, we affirm it. In light of this ruling, we need not address the town's argument under RSA chapter 149-M.

*Affirmed in part; reversed in part; vacated in part; and remanded.*

NADEAU and DUGGAN, JJ., concurred.