NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Waste Management Council
Nos. 2022-0690
      2022-0691


APPEAL OF NEW HAMPSHIRE DEPARTMENT OF ENVIRONMENTAL SERVICES
(New Hampshire Waste Management Council)

APPEAL OF NORTH COUNTRY ENVIRONMENTAL SERVICES, INC.
(New Hampshire Waste Management Council)

Argued: October 3, 2023
Opinion Issued: December 28, 2023


John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (K. Allen Brooks, senior assistant attorney general, and Joshua C. Harrison, assistant attorney general, on the brief, and K. Allen Brooks orally), for the New Hampshire Department of Environmental Services.


Cleveland, Waters and Bass, P.A., of Concord (Bryan K. Gould, Cooley A. Arroyo, and Morgan G. Tanafon on the brief, and Bryan K. Gould orally), for North Country Environmental Services, Inc.

Conservation Law Foundation, of Concord (Heidi H. Trimarco and Thomas F. Irwin on the brief, and Heidi H. Trimarco orally), for Conservation Law Foundation.

DONOVAN, J.  In this consolidated appeal, the New Hampshire Department of Environmental Services (DES) and North Country Environmental Services, Inc. (NCES) appeal an order of the New Hampshire Waste Management Council (Council) granting Conservation Law Foundation's (CLF) appeal of a permit that DES issued authorizing the expansion of a landfill owned by NCES.  DES argues that the Hearing Officer erred because he: (1) incorrectly reviewed, as a question of law rather than fact, DES's determination under RSA 149-M:11, III(a) (2021) that NCES's proposed facility satisfies a capacity need; and (2) incorrectly interpreted RSA 149-M:11, V (2021).  NCES argues that: (1) CLF lacked standing to appeal the permit to the Council; (2) the Hearing Officer erred in his interpretation of RSA 149-M:11, V and by failing to consider administrative gloss; and (3) the Hearing Officer's interpretation of RSA 149-M:11, V renders the statute unconstitutional pursuant to the dormant Commerce Clause of the United States Constitution.  We conclude that CLF had standing to appeal the permit to the Council but that the Hearing Officer erred in his interpretation of RSA 149-M:11, V.  Accordingly, we reverse.

## I.  Facts

The following facts are supported by the record or are otherwise undisputed.  In January 2019, NCES applied to DES for a permit to expand its landfill in Bethlehem.  NCES proposed operating the project, known as Stage VI, for approximately 2.3 years, from 2021 to 2023.  DES indicated to NCES that it was contemplating denying the application for failure to satisfy the capacity need requirement set forth in RSA 149-M:11, III(a) and V. Consequently, NCES withdrew its application.  In March 2020, NCES submitted a new application for Stage VI.  This time, NCES proposed to extend the facility's operating period from 2021 to 2026.

In October 2020, DES approved NCES's application and issued a permit to NCES.  As part of its decision to grant the permit, DES considered New Hampshire's "solid waste capacity need" for the twenty-year period following the grant of the permit.  RSA 149-M:11, V; see also RSA 149-M:11, III(a).  As required by RSA 149-M:11, V(d), DES determined that in 2026, "there is a projected shortfall in existing permitted disposal capacity to accommodate the total quantity of New Hampshire waste projected to be generated statewide." DES found that because "a capacity shortfall exists during the planning period" of Stage VI, meaning that the shortfall would occur in 2026, and Stage VI would operate through 2026, "the proposed facility satisfies a need for disposal capacity within the planning period."  See RSA 149-M:11, V(d).

2

In November 2020, CLF appealed DES's decision to the Council, seeking to have the permit issued to NCES deemed unlawful and unreasonable. NCES filed a motion to dismiss the appeal for lack of standing, arguing that CLF's reliance upon predicted harms to "a minute fraction of its membership" was insufficient to establish standing. In the alternative, NCES sought an evidentiary hearing before the Council to adjudicate the alleged issues of fact created in conflicting affidavits that CLF and NCES submitted. The Hearing Officer denied NCES's motion to dismiss and request for an evidentiary hearing, as well as NCES's subsequent motion for reconsideration.[1]

In February 2022, the Council held a two-day merits hearing, over which a Hearing Officer presided. See RSA 21-M:3, IX(a) (Supp. 2022). On the second day, the Council members deliberated and issued several unanimous findings, including that: (1) "DES acted reasonably in its measuring the short and long-term capacity needs required by [RSA 149-M:11, III(a)] in issuing the permit"; (2) "DES was lawful in finding the capacity need during the life [of the permit]"; and (3) "DES acted reasonably in issuing a permit to help address the capacity needs during the life of the [permit]." In May 2022, the Council issued an order signed by the Hearing Officer that granted CLF's appeal in part and remanded the decision to grant the permit, ruling that DES "acted unlawfully in finding the NCES Facility provided a substantial public benefit" pursuant to RSA 149-M:11, III(a) and V.

In reaching this decision, the Hearing Officer interpreted RSA 149-M:11, V(d) and explained that, to grant a permit, DES must "determine whether a proposed facility provides a substantial public benefit based upon the short- and long-term need for the proposed facility to provide capacity for New Hampshire waste." See RSA 149-M:11, III(a). In turn, the Hearing Officer also explained, RSA 149-M:11, V(d) "details the method by which [DES] must determine the state's solid waste capacity need." Ultimately, the Hearing Officer concluded that RSA 149-M:11, V(d) "explicitly limits a finding of capacity need to only instances where a proposed facility will satisfy a shortfall. If there is no shortfall, there can be no capacity need." Therefore, according to the Hearing Officer, DES erred in granting NCES a permit because Stage VI was proposed to operate for six years, but the first five years of the facility's operation would occur during a period without any shortfall. The Hearing

---

[1] By statute, the attorney general shall appoint hearing officers for appeals to the Council. RSA 21-M:3, VIII (Supp. 2022); RSA 21-O:9 (2020). Once appointed, the hearing officer shall "[a]dopt all findings of fact made by the council except to the extent any such finding is without evidentiary support in the record" and "[d]ecide all questions of law presented during the pendency of the appeal." RSA 21-M:3, IX(c), (e) (Supp. 2022). The hearing officer shall also "provide the council with a proposed written decision on the merits within 45 days of the conclusion of the hearing on the merits" and "[p]repare and issue written decisions on all motions and on the merits of the appeal within 100 days of the conclusion of the hearing on the merits." RSA 21-M:3, IX(f) (Supp. 2022). Thus, we are reviewing the Hearing Officer's legal determinations when we review any question of law set forth in the Council's order.

3

Officer reasoned that because DES could not "lawfully find there to be a capacity need," it could not determine that Stage VI met "the requirement of [RSA 149-M:11, III(a)] when determining substantial public benefit." See RSA 149-M:11, III(a).

Both DES and NCES filed motions to reconsider. In its motion, NCES raised its prior standing argument and argued that the Hearing Officer's interpretation of RSA 149-M:11, V(d) was erroneous and contrary to the administrative gloss that DES had given the provision. DES also argued that the Hearing Officer erred in his interpretation of RSA 149-M:11 (2021), though it proposed an alternative interpretation to the one that NCES presented. The Hearing Officer denied both DES's and NCES's motions to reconsider. NCES and DES appealed to this court, and their appeals were consolidated.

## II. Analysis

### A. Standing

As a preliminary matter, NCES argues that CLF lacked standing to appeal DES's permitting decision to the Council. Specifically, NCES argues that the Hearing Officer erred in denying NCES's motion to dismiss CLF's appeal for lack of standing because: (1) CLF lacked standing to appeal DES's decision to the Council based upon alleged harm to only two CLF members; (2) NCES was entitled to an evidentiary hearing to resolve issues of fact created in conflicting affidavits; and (3) the two affidavits that CLF submitted were insufficient to establish standing because they were premised upon predictions of future harm. CLF contends that the Hearing Officer correctly determined that CLF established standing upon the basis of two members who live close to, and are adversely affected by, the landfill at issue in this appeal. We agree with CLF.

Following CLF's initial appeal to the Council, NCES challenged CLF's standing in a motion to dismiss based upon the fact that CLF relied upon predicted harms to "a minute fraction of its membership" to establish standing. Included with its subsequent objection to NCES's motion to dismiss, CLF provided sworn affidavits from two of its members alleging anticipated harm if Stage VI is approved. NCES filed a reply to CLF's objection and included a sworn affidavit from the manager of its Bethlehem landfill. NCES also sought an evidentiary hearing before the Council to adjudicate the alleged factual discrepancies between CLF's affidavits and NCES's affidavit. The Hearing Officer denied NCES's motion to dismiss and request for an evidentiary hearing, as well as NCES's subsequent motion for reconsideration.

We first consider NCES's argument that CLF lacked standing to appeal DES's decision to the Council based upon alleged harm to only two CLF members. NCES argues that "a membership association or organization has

standing where all its members have sustained the requisite injury from the challenged action." CLF counters that for an organization to establish standing, there is no requirement "that all of an organization's members, or any specified quantity or proportion of an organization's members, must suffer harm."

Standing to appeal DES's decision to grant NCES a permit to the Council is established by statute. See RSA 149-M:8 (2021); RSA 21-O:9, V (2020); RSA 21-O:14, I-a(a) (2020). RSA 21-O:14, I-a(a) provides that "[a]ny person aggrieved by a department decision may, in addition to any other remedy provided by law, appeal" such decision to the Council. In construing similarly worded statutes, we have explained that a "person aggrieved" includes any person who can show some "direct definite interest in the outcome of the proceeding." Goldstein v. Town of Bedford, 154 N.H. 393, 395 (2006) (quotations omitted). Standing, however, "will not be extended to all persons in the community who might feel that they are hurt by the administrative action." Golf Course Investors of NH v. Town of Jaffrey, 161 N.H. 675, 680 (2011) (quotation omitted).

The regulations governing Council proceedings also address standing requirements. See N.H. Admin. R., Env-WMC 204.02(b)(5) (replaced 2023). Specifically, the regulations in effect at the time of CLF's appeal to the Council — and the Hearing Officer's decision — provided that:

A notice of appeal shall include the following:

. . .

(5) A clear and concise statement as to why the appellant has standing to bring the appeal, for example, why the appellant will suffer a direct and adverse affect [sic] as a result of the decision being appealed in a way that is more than any impact of the decision on the general public.

N.H. Admin. R., Env-WMC 204.02(b). Notably, neither the statutory scheme nor these regulations governing appeals to the Council address how many members of an organization must possess standing in order for the organization to establish standing. See RSA 149-M:8; RSA 21-O:9, V; RSA 21-O:14, I-a(a); N.H. Admin. R., Env-WMC 204. We observe that, when the Hearing Officer issued his decision, the regulations in effect in three other environmental councils within DES — the Water Council, the Air Resources Council, and the Wetlands Council — expressly provided for organizational standing when at least one of its members could establish standing. See N.H. Admin. R., Env-WC 203.02(a)(6); N.H. Admin. R., Env-AC 204.02(b)(5) (replaced 2023); N.H. Admin. R., Env-WtC 203.02(b) (replaced 2021).[2] Thus, given that neither the statutory scheme nor

---

[2] We note that, since CLF's appeal to the Council and the Hearing Officer's decision, the Wetlands

5

the regulations governing appeals to the Waste Management Council require that, for an organization to establish standing, it must demonstrate standing for a certain number of its members, we agree with the Hearing Officer that "there is no substantive basis for reaching a different result in an appeal before the Waste Management Council than before any of the other environmental councils." Accordingly, we conclude that the Hearing Officer did not err in ruling that CLF established standing based on harm to only two of its members.

We next consider whether the Hearing Officer erred in denying NCES's request for an evidentiary hearing. Here, CLF's two affiants provided sworn statements describing the adverse effects that they experience as a result of living close to the Bethlehem landfill. Specifically, they stated that the landfill has caused them to experience noise and odor — both inside and outside the home, interference with views, and negative impact on property values. NCES's affiant, the manager of the Bethlehem landfill, averred that both of CLF's affiants have made numerous, unverified complaints over the years about the landfill, and that CLF's affiants' neighbors have experienced neither noise nor odor from the landfill. Additionally, third-party studies acquired by NCES found that the noise from the landfill is "very low" and "would not disturb any person with an ordinary sensitivity to sound," and that NCES is controlling "off-site odors to the maximum extent practicable." Nothing in the landfill manager's affidavit, however, directly contradicts the personal experiences of CLF's affiants. Accordingly, we conclude that, in relying on the uncontroverted sworn statements from CLF's affiants, the Hearing Officer did not engage in impermissible fact finding and did not err in ruling that the landfill manager's affidavit "does not provide a basis for conducting an evidentiary hearing" on the veracity of the sworn statements of CLF's affiants. See RSA 21-M:3, IX(c), (e); cf. Golf Course Investors of NH, 161 N.H. at 680 (explaining that a "decision on standing may be subject to de novo review when the underlying facts are not in dispute").

Next, we consider NCES's argument that the affidavits that CLF presented were insufficient to establish standing because "they rely exclusively on predictions of future harm." CLF counters that future harm is sufficient to provide a basis for standing. We agree with CLF. A party can establish standing when "the appellant has suffered or will suffer an injury in fact." Appeal of

Council, Air Resources Council, and Waste Management Council have adopted new regulations governing each council's procedural rules. See N.H. Admin. R., Ec-Wet 200; N.H. Admin. R., Ec-Air 200; N.H. Admin. R., Ec-Wst 200. Each of these three councils has adopted identical language stating that the appealing party must "[e]stablish that the appellant has standing to bring the appeal." N.H. Admin. R., Ec-Wet 203.03(c)(4)(b); N.H. Admin. R., Ec-Air 203.03(c)(4)(b); N.H. Admin. R., Ec-Wst 203.03(c)(4)(b). Notably, the regulations for the Wetlands Council and the Air Resources Council no longer address how many members must demonstrate standing for an organization to establish standing. See N.H. Admin. R., Ec-Wet 200; N.H. Admin. R., Ec-Air 200.

Londonderry Neighborhood Coalition, 145 N.H. 201, 203 (2000) (emphasis added); see also Golf Course Investors of NH, 161 N.H. at 683-84 (considering whether residents could establish standing based upon injuries they alleged would occur if the planning board approved the contested development plans). Here, CLF's two affiants state that the landfill, in its current state, adversely affects them for numerous reasons, including noise, odor, and interference with views. Thus, we agree with the Hearing Officer that it is not "mere speculation" that the affiants' current, negative experiences caused by their close proximity to the landfill "will continue in the future if the Permit to expand the scope and extend the life of the landfill is implemented as now written."[3] See Hannaford Bros. Co. v. Town of Bedford, 164 N.H. 764, 769 (2013) (explaining that, to establish standing, an injury cannot be speculative). For the foregoing reasons, we conclude that the Hearing Officer did not err in ruling that CLF had standing to appeal DES's issuance of a permit to NCES.

B. Statutory Interpretation

As the appealing parties, NCES and DES bear the burden of demonstrating that the Council's decision is clearly unlawful or unreasonable. Appeal of Conservation Law Found., 174 N.H. 59, 63 (2021); RSA 541:13 (2021); see RSA 21-O:14, III (2020). We will not set aside or vacate the Council's decision unless it contains an error of law, or NCES or DES establish, by a clear preponderance of the evidence, that the Council's decision was unjust or unreasonable. Appeal of Conservation Law Found., 174 N.H. at 63; RSA 541:13. We deem the Council's findings on questions of fact properly before it to be prima facie lawful and reasonable. Appeal of Conservation Law Found., 174 N.H. at 63; RSA 541:13.

On appeal, DES and NCES challenge the Hearing Officer's determination that DES acted unlawfully when it granted NCES a permit to expand its landfill operations. This appeal implicates RSA chapter 149-M (2021 & Supp. 2022), which governs the management of solid waste. See RSA 149-M:1 (2021). The legislature has designated DES responsible for enforcing RSA chapter 149-M. RSA 149-M:4, V (Supp. 2022); RSA 149-M:5 (2021). "Among other solid waste management responsibilities, DES must establish State solid waste management policies and goals, regulate private and public facilities by administering a State permit system, and prepare a statewide solid waste plan." N. Country Envtl. Servs. v. Town of Bethlehem, 150 N.H. 606, 612 (2004); see also RSA 149-M:6 (Supp. 2022).

_____

[3] On appeal, NCES argues that the affiants' statements are insufficient to establish standing solely because they are based upon "predictions of future harm." Thus, we limit our analysis to this question, and we do not consider whether the facts themselves are sufficient to establish standing.

A state permit is required to "construct, operate, or initiate closure" of a solid waste management facility.  RSA 149-M:9, I (Supp. 2022); see also Town of Bethlehem, 150 N.H. at 612.  "DES may not issue a permit unless it determines that the proposed solid waste facility provides 'a substantial public benefit.'"  Town of Bethlehem, 150 N.H. at 612 (quoting RSA 149-M:11, III); see also RSA 149-M:11, IX.  When determining whether a proposed facility provides "a substantial public benefit," DES must consider, as relevant to this appeal, "[t]he short- and long-term need for a solid waste facility of the proposed type, size, and location to provide capacity to accommodate solid waste generated within the borders of New Hampshire, which capacity need shall be identified as provided in paragraph V."  RSA 149-M:11, III(a).  In turn, RSA 149-M:11, V provides the method by which DES shall "determine the state's solid waste capacity need."

We begin by addressing DES's argument that the Hearing Officer incorrectly reviewed DES's determination that Stage VI satisfies a capacity need pursuant to RSA 149-M:11, III(a) as a question of law rather than a question of fact.  CLF counters that the Hearing Officer's invalidation of the permit was "premised on a pure question of law — the plain and unambiguous meaning of RSA 149-M:11 . . . which the Hearing Officer was fully authorized to determine."

A Hearing Officer is required to "[a]dopt all findings of fact made by the council except to the extent any such finding is without evidentiary support in the record" and to "[d]ecide all questions of law."  RSA 21-M:3, IX(c), (e).  The interpretation of a statute presents a question of law.  In re J.S., 174 N.H. 375, 379 (2021).  Here, the Hearing Officer's decision to invalidate DES's permit to NCES was based on a pure question of law — the meaning of "capacity need" pursuant to RSA 149-M:11, III(a) and V.  After interpreting RSA 149-M:11, III(a) and V, the Hearing Officer then applied undisputed facts to his interpretation and concluded that the permit was unlawful.  Accordingly, we agree with CLF that the Hearing Officer's "capacity need determination was premised purely on statutory interpretation" and the application of undisputed facts and, therefore, that the Hearing Officer did not exceed his statutory authority.  See RSA 21-M:3, IX(e).

We next turn to the primary issue on appeal: the interpretation of RSA 149-M:11, V(d) and the meaning of "capacity need."  The interpretation of a statute presents a question of law that we review de novo.  In re J.S., 174 N.H. at 379.  In matters of statutory interpretation, the intent of the legislature is expressed in the words of the statute considered as a whole.  See State v. Pinault, 168 N.H. 28, 31 (2015).  We first look to the language of the statute itself, and, if possible, construe that language according to its plain and ordinary meaning.  Id.  We interpret the statute as written and will not consider what the legislature might have said or add language the legislature did not see

8

fit to include.  Id.  We interpret statutes in the context of the overall statutory scheme and not in isolation.  Id.

As stated above, RSA 149-M:11, V provides that "[i]n order to determine the state's solid waste capacity need, the department shall" conduct a series of inquiries.  See RSA 149-M:11, III(a) (stating that "capacity need shall be identified as provided in paragraph V").  First, DES shall "[p]roject, as necessary, the amount of solid waste which will be generated within the borders of New Hampshire for a 20-year planning period."  RSA 149-M:11, V(a).  Second, DES shall "[i]dentify the types of solid waste which can be managed according to each of the methods listed under RSA 149-M:3 and determine which such types will be received by the proposed facility."  RSA 149-M:11, V(b).  Third, DES shall "[i]dentify, according to type of solid waste received, all permitted facilities operating in the state on the date a determination is made under this section."  RSA 149-M:11, V(c).  Finally, the fourth inquiry, which comprises the primary issue on appeal, requires that DES shall:

> Identify any shortfall in the capacity of existing facilities to accommodate the type of solid waste to be received at the proposed facility for 20 years from the date a determination is made under this section.  If such a shortfall is identified, a capacity need for the proposed type of facility shall be deemed to exist to the extent that the proposed facility satisfies that need.

RSA 149-M:11, V(d) (emphasis added).  It is the meaning of the second sentence of RSA 149-M:11, V(d) that is contested.

The Hearing Officer interpreted RSA 149-M:11, V(d) to mean that "if a proposed facility operates for a period without any shortfall, then [DES] cannot lawfully find there to be a capacity need."  In other words, the Hearing Officer concluded that a capacity need for a proposed facility exists only if a shortfall exists during the entire operating life of the facility.  Therefore, because NCES anticipated operating Stage VI from 2021 to 2026, without a shortfall occurring until 2026, the Hearing Officer ruled that, as a matter of law, no capacity need exists.  On appeal, CLF argues that this interpretation of RSA 149-M:11, V(d) is correct.

Both NCES and DES disagree with this interpretation of paragraph V(d); though, each party proposes a different interpretation of RSA 149-M:11, V(d).  NCES argues that if there is a projected shortfall within the twenty-year planning period, and if the facility will operate within the twenty-year period and provide disposal capacity equal to or less than the projected shortfall, then the proposed facility necessarily satisfies "capacity need" — even if the facility's operation does not overlap with the shortfall.  In contrast, DES argues that, although paragraph V(d) "may embody some kind of relationship between shortfall and capacity, it also reflects a purposeful ambiguity that allows the

9

Department to operate within constitutional and factual constraints" and "indicates that [DES] should use its expertise to determine if the proposed facility 'satisfies' a 'need.'" In other words, DES essentially argues that RSA 149-M:11, V(d) provides the agency with discretion when determining whether "a capacity need for the proposed type of facility" exists. We agree with DES.

We begin our interpretation, as we must, by considering the plain language of RSA 149-M:11, V(d), which instructs DES how to determine whether a proposed facility satisfies a capacity need. The statute provides that if a shortfall is identified within "20 years from the date a determination is made under this section," then "a capacity need for the proposed type of facility shall be deemed to exist to the extent that the proposed facility satisfies that need." RSA 149-M:11, V(d). In effect, pursuant to paragraph V(d), DES must determine whether: (1) there will be a shortfall in the capacity of existing facilities over a twenty-year planning period, starting from the date that the permit is expected to be granted; and (2) if there is a shortfall, whether a capacity need exists. Id. A capacity need exists "to the extent that the proposed facility satisfies that need." Id.

We note that paragraph V(d) uses two different terms: "shortfall" and "capacity need." Id. The Hearing Officer and CLF mistakenly treat the terms "capacity need" and "shortfall" as synonymous, contrary to our principles of statutory construction and the plain meaning of the statute.[4] See State v. Bakunczyk, 164 N.H. 77, 79 (2012) ("[W]hen the legislature uses two different words, it generally means two different things."); Garand v. Town of Exeter, 159 N.H. 136, 141 (2009) ("[W]henever possible, every word of a statute should be given effect." (quotation omitted)). Paragraph V(d) provides that if "a shortfall is identified, a capacity need for the proposed type of facility shall be deemed to exist to the extent that the proposed facility satisfies that need," thus differentiating the existence of a "shortfall" from the existence of a "capacity need." RSA 149-M:11, V(d) (emphases added). Determining whether a capacity need exists, based upon the extent to which a proposed facility satisfies said capacity need, requires an inquiry that is separate and distinct from whether a shortfall exists. Although the existence of a shortfall relates to the existence of a capacity need — indeed, a capacity need can exist only if a shortfall exists — it does not compel a finding of a capacity need. Rather, the existence of a shortfall allows DES to engage in the capacity need analysis.

Given this conclusion, we next consider the separate meanings of "shortfall" and "capacity need" as used in RSA 149-M:11, V(d). A "shortfall," as

[4] For example, in the order denying DES's motion to reconsider, the Hearing Officer stated that RSA 149-M:11, V(d) "uses the word 'satisfies,' creating the requirement that a proposed facility 'satisfy' a capacity need/shortfall: the statute creates a direct link between granting a proposed facility and said facility's ability to 'satisfy' a capacity need/shortfall." (Emphases added.) The Hearing Officer conflates the term "shortfall" with "capacity need" as indicated by its statement that RSA 149-M:11, V(d) requires that a proposed facility satisfy a "capacity need/shortfall."

described in RSA 149-M:11, V, exists when, during the twenty-year planning period, the state generates more waste of the type to be received at the proposed facility than existing facilities can accommodate. Here, the parties do not appear to dispute the meaning of "shortfall" or DES's projection that a shortfall will occur in 2026.

"Capacity need," on the other hand, is defined in relation to itself. RSA 149-M:11, V(d) ("[A] capacity need for the proposed type of facility shall be deemed to exist to the extent that the proposed facility satisfies that need." (emphases added)). This determination raises a question of fact: (1) whether a capacity need for the proposed facility exists, which (2) is dependent on the extent that the proposed facility satisfies that need. Id. Paragraph V places resolution of this question squarely within DES's discretion by providing that "[i]n order to determine the state's solid waste capacity need, the department shall" deem a capacity need to exist "to the extent that the proposed facility satisfies that need." RSA 149-M:11, V (emphasis added). Accordingly, we conclude that, pursuant to RSA 149-M:11, V(d), the existence of a "capacity need" for a proposed facility is a discretionary determination that DES must make if it projects that a shortfall will occur within the twenty-year statutory planning period.

CLF agrees with the Hearing Officer's interpretation of the terms "to the extent" and "satisfies" in RSA 149-M:11, V(d) to support its position that a proposed facility can satisfy a capacity need only if it operates exclusively during a period of shortfall. DES responds that:

> [T]he terms "to the extent" and "satisfies" in paragraph V(d) do not refer to mathematically quantifiable subjects like "shortfall" or the amount of "waste generated in New Hampshire." Instead, these terms refer to the more qualitative concept of "need," which they then relate to itself. By stating it in this manner, the Legislature left open the possibility that satisfying a capacity "need" includes more than a simple mathematical relationship to "shortfall."

We agree with DES. The Hearing Officer's application of his definitions of the terms "to the extent" and "satisfies" was premised on an incorrect assumption that "capacity need" is synonymous with "shortfall." Thus, his analysis improperly focused on "the extent that the proposed facility satisfies" the shortfall, rather than "the extent that the proposed facility satisfies" the capacity need. RSA 149-M:11, V(d).

CLF also argues that the Hearing Officer was correct in concluding that the statute's use of the present tense "satisfies" mandates that a "present-action relationship must exist between the capacity need and the proposed facility," and, as a result, the proposed facility must operate exclusively during periods of shortfall. This interpretation is problematic for two reasons. First,

as we have observed, it incorrectly conflates the term "capacity need" with "shortfall." Therefore, even if the use of present tense "satisfies" indicates a temporal requirement, such a requirement would only necessitate that the proposed facility operate during periods of capacity need — not periods of shortfall. See RSA 149-M:11, V(d).

Second, we disagree that the present tense of "satisfies" as used in RSA 149-M:11, V(d) requires the proposed facility to operate exclusively during periods of "capacity need." RSA 149-M:11, V(d) provides that a "capacity need" exists "to the extent that the proposed facility satisfies that need." The provision does not impart any temporal relationship between the proposed facility's operation and the period of capacity need. As long as the proposed facility "satisfies" the capacity need in some manner and at some time, DES maintains discretion to determine that a capacity need for the proposed facility exists. Indeed, the only temporal requirement set forth in RSA 149-M:11, V(d) is that, for DES to consider whether a capacity need exists, a shortfall must be identified at some point during the twenty-year planning period. Thus, the use of the present tense "satisfies," in and of itself, is insufficient to mandate the strict temporal relationship that the Hearing Officer found and CLF argues exists. See 82 C.J.S. Statutes § 412, at 558 (2022) ("A statute written in the present or future tense normally will be applied not only to existing things and conditions but also prospectively to future things and conditions."); cf. Cincinnati Specialty Underwriters Ins. Co. v. Best Way Homes, 175 N.H. 142, 148 (2022) (interpreting "the present tense language in the exclusionary provision [of an insurance policy] as having 'no temporal reference'"). Accordingly, for DES to determine that a capacity need exists, a proposed facility does not need to operate exclusively during periods of capacity need.

NCES argues what is essentially the inverse of CLF's argument: if DES identifies a shortfall at any point within the statutory twenty-year period, then DES must determine that a capacity need exists. We disagree. RSA 149-M:11, V(d) instructs DES to "identify any shortfall in capacity," and "if such a shortfall is identified," to determine the existence of a capacity need. Nothing in the language of paragraph V(d) requires DES to find that a capacity need exists solely because there is a projected shortfall. Although the existence of a shortfall within the statutory period allows DES to determine that the proposed facility will satisfy a capacity need, a shortfall does not compel DES to reach such a conclusion. Therefore, even if DES projects a shortfall within the twenty-year planning period, DES may nevertheless deny a permit if it determines that the proposed facility will not satisfy the capacity need.

Our interpretation that RSA 149-M:11, V(d) grants DES discretion to determine whether a capacity need exists is further supported by RSA 149-M:11 as a whole. RSA 149-M:11, III(a) requires DES to determine the "short- and long-term need for a solid waste facility of the proposed type, size, and location." The Hearing Officer correctly stated that whether DES "acted

12

reasonably in determining the 'short- and long-term' capacity need for the NCES Facility required under [RSA 149-M:11, III(a)] is a question of fact."  If, however, capacity need is tied solely to the existence of a shortfall and the facility's exclusive operation during said shortfall, then any discretion that DES has to identify the "short- and long-term need" for the proposed facility is essentially eliminated.  RSA 149-M:11, III(a).  Moreover, the requirement set forth in paragraph III(a) that DES evaluate the short- and long-term capacity need for a proposed facility would be unnecessary if a finding of capacity need can occur only when a facility operates exclusively during a shortfall.

Our interpretation also comports with the purpose of RSA 149-M:11.  RSA 149-M:11, I, states that the purpose of the public benefit requirement is, inter alia, to "provide for the solid waste management need of the state and its citizens" and to "ensure that adequate capacity exists within the state to accommodate the solid waste generated" within the state.  We agree with NCES that "[t]here is a substantial difference between ensuring that there is an adequate supply of a resource for a consumer and limiting that supply to the amount necessary to meet the needs of that consumer."  Our interpretation of RSA 149-M:11, V(d) requires DES to "[i]dentify any shortfall" prior to determining the existence of a capacity need.  This conclusion best enables DES to meet its obligation to "provide for the solid waste management needs of the state and its citizens" and "ensure that adequate capacity exists within the state to accommodate the solid waste generated" within New Hampshire.  See RSA 149-M:11, I(a), (b).

### III. Conclusion

For the foregoing reasons, we conclude that RSA 149-M:11, V(d) provides DES with flexibility and discretion to determine the existence of a capacity need and, therefore, how to address a projected shortfall.  Given our conclusion that the statute is unambiguous, we need not consider the statute's legislative history or NCES's administrative gloss argument.  See Polonsky v. Town of Bedford, 171 N.H. 89, 93 (2018) ("Absent an ambiguity, we will not look beyond the language of the statute to discern legislative intent.").  Additionally, given that we reject the Hearing Officer's interpretation, we need not address NCES's argument that the Hearing Officer's interpretation violates the dormant Commerce Clause of the Federal Constitution.  In light of our ruling, we also have no occasion to address CLF's motion to strike evidence from the record that supports NCES's administrative gloss argument.  NCES's outstanding motion for an extension of time to object to CLF's motion for summary affirmance is deemed moot.  Accordingly, we conclude that DES acted lawfully in issuing the permit and reverse.

Reversed.

BASSETT and HANTZ MARCONI, JJ., concurred.

13